# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>SCOTT THOMPSON,<br><br>*Defendant*. | Miscellaneous Docket No.:  1:07-mc-00241-RJL<br><br>THE WILLIAMS COMPANIES, INC.'S APPLICATION FOR RELIEF PURSUANT TO LCrR 57.6 |

**THE WILLIAMS COMPANIES, INC.'S
APPLICATION FOR RELIEF PURSUANT TO LCrR 57.6
IN UNITED STATES v. SCOTT THOMPSON (1:06-cr-00288-RJL-1)**

F. Joseph Warin (D.C. Bar No. 235978)
  *Counsel of Record*
Peter E. Jaffe
Andrew S. Boutros
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorneys for The Williams Companies, Inc. and
Williams Power Company, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

FACTS ................................................................................................................................... 3

ARGUMENT .......................................................................................................................... 5

I.      THE MATERIALS SOUGHT BY DEFENDANT ARE ATTORNEY-
        CLIENT AND ATTORNEY-WORK-PRODUCT PROTECTED. ........................ 5

II.     INVOLUNTARY PRODUCTION OF PRIVILEGED MATERIALS
        DOES NOT WAIVE THE ATTORNEY-CLIENT PRIVILEGE. ......................... 6

III.    WILLIAMS' PRODUCTION OF ATTORNEY-CLIENT
        MATERIALS TO THE GOVERNMENT WAS INVOLUNTARY ..................... 12

        A.      *The Government Has Historically Treated Cooperation as a
                Condition of Leniency.* .................................................................... 12

        B.      *The Federal Government Conditioned Avoidance of
                Enforcement and Criminal Prosecution Actions on Production
                of Privileged Information.* ............................................................... 13

        C.      *Companies Had No Choice: They Had to Comply with the
                Government's Demands for Production of Privileged
                Information.* ..................................................................................... 18

        D.      *A Wide Range of Authorities Agree that the Government's
                Investigatory Tactics Were Coercive.* ............................................ 20

IV.     WILLIAMS PRODUCED PRIVILEGED MATERIALS TO THE
        GOVERNMENT INVOLUNTARILY ............................................................... 25

V.      WILLIAMS DID NOT WAIVE ITS WORK-PRODUCT
        PROTECTIONS. ............................................................................................... 29

CONCLUSION ..................................................................................................................... 36

i

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ........................................................ 19

*Boykin v. Alabama*, 395 U.S. 238 (1969) ................................................................................. 10

*Cobell v. Norton*, 213 F.R.D. 69 (D.D.C. 2003) .............................................................. 4, 5, 7, 9

*Garrity v. New Jersey*, 385 U.S. 493 (1967) ................................................................................. 8

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003) ................................................................................................................................. 34

*Hickman v. Taylor*, 329 U.S. 495 (1947) ................................................................................. 4, 6

*Hicks v. Bush*, 452 F. Supp. 2d 88 (D.D.C. 2006) ..................................................................... 10

*In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672 (D.C. Cir. 1979) ...................... 9

*In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989) ............................................................... passim

*In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740 (D.C. Cir. 2006) ................................................................................................. 34

*In re Subpoena Issued to Commodity Futures Trading Comm'n*, 370 F. Supp. 2d 201 (D.D.C. 2005), *aff'd in part on other grounds*, 439 F.3d 740 (D.C. Cir. 2006) ...................... 34

*In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C. Cir. 1984) ......................................... passim

*Leyra v. Denno*, 347 U.S. 556 (1954) ......................................................................................... 8

*Machibroda v. United States*, 368 U.S. 487 (1962) ................................................................... 10

*Moran v. Burbine*, 475 U.S. 412 (1986) ..................................................................................... 8

*Morrison v. Int'l Programs Consortium, Inc.*, 205 F.R.D. 61 (D.D.C. 2002) ............................ 10

*People v. Whitson*, 949 P.2d 18 (Cal. 1998) ................................................................................ 7

*Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir. 1981) ........................................ passim

*Qualls v. Rumsfeld*, 412 F. Supp. 2d 40 (D.D.C. 2006) ............................................................ 10

*Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598 (D.C. Cir. 2001) ..................................... 4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*SEC v. Forma*, 117 F.R.D. 516 (S.D.N.Y. 1987) ............................................................ 8

*Transamerica Computer Corp. v. IBM Corp.*, 573 F.2d 646 (9th Cir. 1978) ................................ 7

*United States v. AT&T*, 642 F.2d 1285 (D.C. Cir. 1980) ...................................... 6, 7, 32

*United States v. Garcia*, 544 F.2d 681 (3d Cir. 1976) .................................................... 8

*United States v. Hammond*, 841 F. Supp. 421 (D.D.C. 1993) ...................................... 10

*United States v. Jara*, 973 F.2d 746 (9th Cir. 1992) ...................................................... 8

*United States v. New Wrinkle, Inc.*, [1954] Trade Cas. (CCH) ¶ 67,883 (S.D. Ohio 1954) ........................................................................................................... 9, 10

*United States* v. *Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) ................................ 20, 21

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ...................................... 4, 5, 6, 29

## Statutes

Attorney-Client Privilege Protection Act, S. 30, 109th Cong. (2006) .......................................... 24

The Attorney-Client Privilege Protection Act of 2007, S. 186, 110th Cong. (2007), http://www.thomas.gov/cgi-bin/query/z?c110:S186: ............................................... 24

## Rules

FED. R. CIV. P. 26 ................................................................................................................ 4, 5

## Other Authorities

CFTC Policy Statement Relating to the Commission's Authority to Impose Civil Money Penalties and Futures Self-Regulatory Organization's Authority to Impose Sanctions; Penalty Guidelines, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26, 265 (November 1994) .................................................................. 16

Exec. Order 13271, 67 Fed. Reg. 46,091 (July 9, 2002) ............................................. 14

Holder, Eric, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum to Component Heads and U.S. Attorneys on Bringing Criminal Charges Against Corps. (June 16, 1999), , U.S. Attorney's Manual, tit. 9, Criminal Resource Manual, art. 162, Federal Prosecution of Corporations (2000), www.usdoj.gov/usao/eousa/foia_reading_room/usam/ ............................................. 14

## TABLE OF AUTHORITIES
### (continued)

Page(s)

McNulty, Paul J., Deputy Att'y Gen., Memorandum on Principles of Federal
  Prosecution of Business Organizations to heads of Department Components,
  United States Attorneys (December 12, 2006),
  http://www.usdoj.gov/dag/speech/2006/mcnulty_memo.pdf ................................................... 24

*The Thompson Memorandum's Effect on the Right to Counsel in Corporate
  Investigations: Hearing Before the Sen. Jud. Comm.*, 109th Cong. ............................ 20, 23, 24

Thompson, Larry, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum to
  Component Heads and U.S. Attorneys on Principles of Fed. Prosecution of Bus.
  Orgs. (January 20, 2003), http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm ........ 15, 16

U.S. Commodity Futures Trading Commission, Enforcement Advisory, Cooperation
  Factors in Enforcement Division Sanction Recommendations (Aug. 11, 2004),
  http://www.cftc.gov/files/enf/enfcooperation-advisory.pdf .................................................... 16

U.S. Federal Energy Regulatory Commission, Policy Statement on Enforcement (Oct.
  20, 2005), http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=10855343 ................ 17

U.S. SENTENCING GUIDELINES MANUAL § 8C2.5 (1991) ................................................. 13, 18, 22

*White Collar Enforcement (Part I): Attorney-Client Privilege and Corporate Waivers
  Before the H. Comm. On the Judiciary Subcommittee on Crime, Terrorism, and
  Homeland Security*, 109th Cong. (2006) ........................................................................... 18, 23

### Secondary Sources

Alexander, Cindy R., *On the Nature of the Reputational Penalty for Corporate
  Crime: Evidence*, 42 J. L. AND ECON. 489 (1999) .................................................... 19

American Bar Association, Press Release, *ABA President Robert Grey Creates Task
  Force to Advocate for Attorney-Client Privilege*, Oct. 6, 2004 ................................ 22

Bhagat, Sanjai, *et al.*, *The Shareholder Wealth Implications of Corporate Lawsuits*,
  27 (Winter) FIN. MGMT. 5 (1998) ...................................................................... 19, 20

BLACK'S LAW DICT. (6th ed. 2000) ......................................................................... 7, 8

Browning, Lynnley, *Former Deputy at Justice Dept. Would Limit Legal Disclosure*,
  N.Y. TIMES, Dec. 1, 2006 ........................................................................................ 22

# TABLE OF AUTHORITIES
### (continued)

Page(s)

Cole, Lance, *Revoking Our Privileges:  Federal Law Enforcement's Multi-Front Assault on the Attorney-Client Privilege (And Why it is Misguided)*, 48 VILL. L. REV. 469 (2003).................................................................................................. 13

CORPORATE FRAUD TASK FORCE, FIRST YEAR REPORT TO THE PRESIDENT (2003), http://www.usdoj.gov/dag/cftf/first_year_report.pdf........................................... 15, 16

Duggin, Sarah Helene, *The Impact of the War Over the Corporate Attorney-Client Privilege on The Business of Am. Health Care*, 22 J. CONTEMP. HEALTH L. & POL'Y 301 (2006)................................................................................................ 22

El Paso Trading Unit Agrees to Pay $20 Million to Settle CFTC Charges of Attempted Manipulation and False Reporting, CFTC Release No. 4765-03 (March 26, 2003), http://www.cftc.gov/opa/enf03/opa4765-03.htm .................................... 17

Elkind, Peter, *The Law Firm of Hubris, Hypocrisy & Greed*, FORTUNE MAGAZINE (Nov. 13, 2006)..................................................................................................... 19

Finder, Lawrence D., & Ryan D. McConnell, *Devolution of Authority:  The Department of Justice's Corporate Charging Policies*, 51 ST. LOUIS U. L.J. 1 (2006)............................................................................................................... 14

Greco, Michael, *U.S. Department of Justice Should Rethink Policy of Coercing Waiver of Attorney-Client Privilege*, Opinion Editorial by ABA President Michael S. Greco Issued April 17, 2006.................................................................. 22

Gruner, Richard S., *Towards an Organizational Jurisprudence:  Transforming Corporate Criminal Law Through Federal Sentencing Reform*, 36 ARIZ. L. REV. 407 (1994)................................................................................................... 12

Letter from 10 Former Senior Department of Justice Officials to Attorney General Alberto Gonzalez 1 (September 5, 2006), http://www.abanet.org/buslaw/attorneyclient/materials/065/065.pdf....................................... 21

Loomis, Tamara, *Privilege Waivers:  Prosecutors Step Up Use of Bargaining Chips*, 224 N.Y.L.J. 5 (2000) .............................................................................. 13

Morvillo, Robert, *The Decline of the Attorney-Client Privilege*, 18 N.Y.L.J. 3 (1997).............. 13

Podgor, Ellen S., *White-Collar Cooperators:  The Government in Employer-Employee Relationships*, 23 CARDOZO L. REV. 795 (2002) ..................................... 13

Rakoff, Jed S., *Coerced Waiver of Corporate Privileges*, 214 N.Y.L.J. 3 (1995) ...................... 13

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Terwilliger, George J., *Corporate Criminal Investigations*, 40 No. 1 PRAC. LAW. 61
    (1994) ..................................................................................................................... 13

Thomas, George C., III, *A Philosophical Account of Coerced Self-incrimination*, 5
    YALE J.L. & HUMAN. 79 (1993) ............................................................................. 9

Wray, Christopher A., Asst. Att'y Gen., Crim. Div., DOJ, Remarks at the A.B.A.
    White Collar Crime Luncheon 3 (Feb. 25, 2005),
    http://www.usdoj.gov/criminal/pr/speeches/2005/02/2005_3853_rmrkCrimLunche
    on030205.pdf .......................................................................................................... 19

Zornow, David M., & Keith D. Krakaur, *On the Brink of a Brave New World:  The
    Death of Privilege in Corporate Criminal Investigations*, 37 AM. CRIM. L. REV.
    147 (2000) ................................................................................................................ 14

The Williams Companies, Inc. and the Williams Power Company, Inc. (formerly, Williams Energy Marketing & Trading Company) (hereinafter and unless otherwise noted, collectively referred to as "Williams"), by and through counsel,[1] hereby submit this application for relief pursuant to LCrR 57.6 in *United States v. Scott Thompson* (1:06-cr-00288-RJL-1). Williams opposes Defendant Scott Thompson's "Motion to Compel the Government's Disclosure of Material Voluntarily Disclosed to it by The Williams Companies, Inc."[2]

## INTRODUCTION

The avalanche of corporate fraud scandals earlier in this decade produced a near manic response by all stakeholders. The previous regime gave way to an environment in which prosecutors promulgated new measures and policies, and corporations were pushed to bankruptcies, reorganizations, and dramatic downsizing. In this environment, corporations understood that they had no choice but to produce privileged materials. This was a unique period of time in corporate criminal investigations. This began as a policy of the government in June 1999 with the issuance of the Holder Memorandum. This policy lasted only until December 2006 with the issuance of the McNulty Memorandum. Accordingly, the facts at issues here must be viewed through this historical prism.

---

[1]  Gibson, Dunn & Crutcher LLP was retained and hired in 2005, long after the government's conduct as described herein.

[2]  Williams understands that Defendant has filed a motion for an order directing the Clerk to issue certain subpoenas *duces tecum*, including a subpoena directed towards Williams, and that the government takes no position with respect to that motion. By filing this Application in response to Defendant's Motion to Compel, Williams does not waive its rights to file a motion to quash or otherwise oppose any subpoena sought by Defendant. Williams explicitly reserves the right to assert any and all arguments relating to said motion in any subsequent briefing, including all arguments set forth in this Application.

In 2002, faced with the threat of criminal prosecution, Williams produced to the federal government certain privileged documents and information. Williams would not have produced—and did not produce—these documents voluntarily. Rather, Williams produced these documents in the face of the government's repeated and unequivocal statements to Williams, both directly and through stated policy, that unless Williams produced these documents the government would consider Williams uncooperative, increasing the risk of indictment.

On June 4, 2007, Judge Prager of the Superior Court of California, County of San Diego, reviewed this very matter and held that Williams (and other similarly-situated energy companies) never waived its attorney-client or work-product protections because the federal government coerced Williams into surrendering these materials. *See* Order, *Coordination Proceeding Natural Gas Anti-Trust Cases*, No. JCCP4221 (Sup. Ct. Cal. June 4, 2007) (attached as Exhibit A). Although Judge Prager applied California state law, the law of this Circuit similarly makes clear that an involuntary production of privileged information is not a waiver of the attorney-client privilege and is an important factor militating against finding waiver of the work-product doctrine.

Williams does not challenge that under the law of this Circuit, there can be no "selective waiver" of the attorney-client privilege. *See Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981). As the recent California decision explains, the "selective waiver" doctrine, which provides that a party may waive its privileges with respect to some adverse parties but not others, is not at issue here. *See* Order, *Natural Gas*, at 2. It is rather the case that Williams *never* waived its attorney-client and work-product protections with respect to *any* party because the only production that occurred here—to the United States—was involuntary. Indeed,

the economic duress under which Williams produced its privileged work-product documents only further confirms this conclusion.

Although Williams incorporates and adopts the government's arguments explaining why Williams' work product requires protection, *see* Department of Justice Brief at 8-12 (hereinafter "DOJ Brief"), Williams' conceptualization of the issue focuses on the facts and circumstances in 2002 and 2003. Because Williams' productions of privileged, work-product materials were involuntary, and because involuntary productions do not waive the attorney-client privilege and counsel against waiver of work-product doctrine, Defendant is not entitled to Williams' privileged and protected materials. Defendant's Motion to Compel should be denied.

## FACTS

In 2002, government authorities, including the United States Attorney's Office for the Northern District of California ("USAO"), the United States Department of Justice ("DOJ") (collectively, USAO and DOJ will be referred to as "Federal Prosecutors"), and the Commodity Futures Trading Commission ("CFTC"), commenced investigations into Williams' gas and energy trading practices.

On October 23, 2002, the CFTC issued a subpoena *duces tecum* to Williams. In early November 2002, the District Court for the Northern District of California issued a grand jury subpoena to Williams.

Williams conducted an internal review of its trading activities, including its reporting of information regarding natural gas trades to energy publications. *See* Declaration of Alex A. Goldberg In Opposition to Defendant's Motion to Compel (hereinafter "Goldberg Declaration") at ¶ 2 (attached as Exhibit B). Williams retained outside counsel and also used its in-house lawyers to assist in this review and to provide legal advice to Williams. *See* Goldberg

3

Declaration at ¶¶ 2-5.  During the course of the review, Williams' attorneys prepared a number

of attorney-client privileged and work-product documents.  *See id.* at ¶¶ 3-5.

     As part of their review, Williams' attorneys conducted confidential interviews of

Williams employees.  *See id.* at ¶ 3.  During those interviews, the attorneys took notes, which

included the contents of attorney-client communications and attorneys' thoughts, impressions,

opinions, and theories regarding the witnesses and the information obtained.  *See id.*  Therefore,

these notes constitute both privileged attorney-client communications and "core" attorney work

product (the "Privileged Attorney Notes").  *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947);

*Cobell v. Norton*, 213 F.R.D. 69, 77 (D.D.C. 2003) ("core work product" consists of documents

that contain "'the mental impressions, conclusions, opinions, or legal theories'" of counsel)

(quoting FED. R. CIV. P. 26(b)(3)).  Defendant seeks these Privileged Attorney Notes.  *See*

Defendant's Brief at 2.

     Through and under the supervision of its attorneys, Williams conducted certain analyses

and reports of natural-gas data drawn from Williams' gas-transaction databases (the "Privileged

Data Analysis").  *See* Goldberg Declaration at ¶ 4.  The Privileged Data Analysis contained and

reflected, among other things, communications protected by the attorney-client privilege and

attorney work-product doctrine and reflected the mental impressions, legal theories, and opinions

of counsel.  *See id.*  Documents such as these, prepared by a company, at the direction of

company counsel, so that counsel may provide legal advice, are undoubtedly privileged and

work-product protected.  *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *Rockwell

Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604-05 (D.C. Cir. 2001).

     Williams and its attorneys also delivered presentations to Federal Prosecutors  (the

"Privileged Presentations").  *See* Goldberg Declaration at ¶ 5.  These presentations and their

4

attendant written materials reflected the opinions of Williams and its counsel and were intended

to persuade the government not to initiate criminal charges against Williams.  *See id.*

Accordingly, there are three categories of documents that are in dispute:  (1) Privileged

Attorney Notes, (2) Privileged Data Analysis, and (3) Privileged Presentations.[3]

## ARGUMENT

### I.    THE MATERIALS SOUGHT BY DEFENDANT ARE ATTORNEY-CLIENT AND ATTORNEY-WORK-PRODUCT PROTECTED.

The attorney-client privilege is the "oldest of the privileges for confidential

communications known to the common law."  *Upjohn*, 449 U.S. at 389.  Confidential interviews

of employees conducted by corporate counsel as part of an internal investigation and

commanded by "corporate superiors in order to secure legal advise from counsel" concerning

"matters within the scope of the employees' corporate duties" are privileged attorney-client

communications.  *Id.* at 394.

Although the protections it provides—especially of core work product—are equally

sacrosanct, *see Cobell*, 213 F.R.D. at 77 ("'opinion work product enjoys a nearly absolute

immunity and can be discovered only in very rare and extraordinary circumstances'") (citation

omitted), the attorney-work-product doctrine encompasses a universe of material much broader

than the attorney-client privilege.  *See In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1371 (D.C.

Cir. 1984).  The work-product doctrine protects the mental processes of the attorney and prevents

outside parties from hijacking the attorney's industry and efforts.  *See* Fed. R. Civ. P. 26(b)(3);

---

[3]  In a footnote, Defendant suggests that the government may not have standing to "resist
Defendant's motion on the basis of Williams' privileges."  Defendant's Reply Brief at 2 n.1
(emphasis removed).  By filing its brief here, Williams remediates any such alleged
deficiencies.

*see also Hickman*, 329 U.S. at 510-11; *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Interview notes, summaries, and memoranda constitute quintessential core work product and their production to third parties is highly "disfavored." *Upjohn*, 449 U.S. at 399; *see also Hickman*, 329 U.S. at 511.

Here, there can be no doubt that the Privileged Attorney Notes, Privileged Data Analysis, and Privileged Presentations are all shrouded in the sanctity of the attorney-client and work-product protections.[4]

## II.    INVOLUNTARY PRODUCTION OF PRIVILEGED MATERIALS DOES NOT WAIVE THE ATTORNEY-CLIENT PRIVILEGE.

Williams respectfully disagrees with the DOJ that Williams "waived its attorney-client privilege when it produced the above-described materials to the government." DOJ Brief at 4. On June 4, in reviewing this very production of privileged material, the California Superior Court held that Williams—and a consortium of other similarly-situated gas and energy companies—did not waive any privilege, because the government's tactics in the gas-misreporting investigation of requiring companies to produce privileged materials as a condition of "full cooperation" was coercive. *See* Order, *Natural Gas*, at 2-3. The court's analysis turned on the meaning of "coercion" in the California Evidence Code. *See id.* at 2. The state code, however, merely codified longstanding judicial standards for voluntariness similar to the case

---

[4] Defendant suggests in passing in his reply brief that these materials may not be work product. *See* Defendant's Reply Brief at 1. Sixty years ago, however, the Supreme Court held squarely that materials such as these are all quintessentially work product. *See, e.g.*, *Hickman*, 329 U.S. at 510-11. Moreover, Defendant's arguments prove too much; if taken seriously, then the interview memoranda, legal and factual analyses, drafts, trial strategy documents, and expert work product generated or requested by a party in preparation for litigation would all be unprotected, including the Defendant's very own materials in this case.

law of this Circuit.  *See id.* (relying on *People v. Whitson*, 949 P.2d 18, 28 (Cal. 1998) (finding

that waiver of *Miranda* rights is voluntary if it is the "product of a free and deliberate choice

rather than intimidation, coercion, or deception") (internal quotations omitted)).  Accordingly,

the court found with respect to the *identical* set of documents and *identical* government conduct

at issue here, that Williams did not waive the attorney-client and attorney-work-product

protections and that third parties were not entitled to those materials.

Those standards apply with equal vigor in this Court.  The D.C. Circuit has long and

consistently recognized that the attorney-client privilege is not waived by an involuntary

production to a third party; instead, a condition precedent for waiver is voluntary disclosure.  *See*

*Permian Corp.*, 665 F.2d at 1219 (quoting *AT&T*, 642 F.2d at 1299); *see also id.* at 1221 n.14;

Order, *Natural Gas*, at 2 (distinguishing *Subpoenas Duces Tecum* and similar authorities on the

ground that in these cases it was undisputed that the documents at issue were "voluntarily

disclosed").  An "involuntary" action is "that which is performed with constraint . . . or with

repugnance, or without the will to do it.  An action is involuntary, then, which is performed

under duress, force, or coercion."  BLACK'S LAW DICT. 827 (6th ed. 2000).

Consistent with this understanding, the D.C. Circuit in *In re Sealed Case*, 877 F.2d 976

(D.C. Cir. 1989), identified two scenarios that would give rise to a finding of involuntariness in

the context of waiver of the attorney-client privilege.  The first is "court-compelled disclosure."

*Id.* at 980 (citing *Transamerica Computer Corp. v. IBM Corp.*, 573 F.2d 646, 651 (9th Cir. 1978)

(holding that the factual circumstances surrounding trial court's discovery order amounted to a

"compelled disclosure" negating the claim of waiver; holding turned on fact that defendant was

ordered to produce for inspection 17 million pages, collected from various branch offices, within

three months)); *see also Cobell*, 213 F.R.D. at 75 (submission of privileged documents to a

judicial officer acting pursuant to the authority vested in him by court order did not result in waiver of the privilege); *United States v. Jara*, 973 F.2d 746, 749 (9th Cir. 1992). The second is "other equally extraordinary circumstances." *In re Sealed Case*, 877 F.2d at 980. One such extraordinary circumstance is coercion by the government. *See, e.g.*, *SEC v. Forma*, 117 F.R.D. 516, 523 (S.D.N.Y. 1987) ("A waiver coerced by governmental officials may be involuntary and therefore invalid").

"Coercion" is the use of power or authority to achieve compliance with the coercer's chosen course of action. *See* BLACK'S LAW DICT. 258 (6th ed. 2000). "It may be actual, direct, or positive . . . or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse." *Id.* In determining whether coercion has occurred, courts examine the "totality of the circumstances" and the means used to achieve compliance. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (holding that *Miranda* rights may be waived only if the "totality of the circumstances" reveals that waiver was an involuntary choice) (citation and internal quotation marks omitted); *see also Leyra v. Denno*, 347 U.S. 556, 558 (1954).

Coercive circumstances give the illusion of two possible courses of action, compliance and non-compliance, but the threatened consequence that accompanies non-compliance is so severe that it makes non-compliance a non-choice. For example, the Supreme Court has held that "[t]he option to lose [one's] means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967); *see also United States v. Garcia*, 544 F.2d 681, 685 (3d Cir. 1976) (finding a violation of defendants' Fifth Amendment rights when they were put to a "Hobson's choice: remain silent and lose the opportunity to be the objects of leniency, or speak and run the risk of

additional prosecution.").  Therefore, although a person facing the question, "your money or your life," has  a choice in a literal sense, the practical reality is that there is no rational or actual choice.  *See* George C. Thomas III, *A Philosophical Account of Coerced Self-incrimination*, 5 YALE J.L. & HUMAN. 79, 80 (1993).  Accordingly, the appropriate point of inquiry in determining whether a situation is coercive is the threatened consequence and how, in light of the threatened consequence, a rational person or entity would act.  *Id.*

This Court has discussed with approval *United States v. New Wrinkle, Inc.*, [1954] Trade Cas. (CCH) ¶ 67,883 (S.D. Ohio 1954), a case that found the attorney-client privilege was not waived under circumstances described as coercive.[5]  *See Cobell*, 213 F.R.D. at 76.  In *New Wrinkle, Inc.*, the defendant allowed the federal government to inspect its corporate files and records, but the tactics the government employed were coercive and, therefore, no waiver occurred.  *See Cobell*, 213 F.R.D. at 76.  In reaching its decision, the Southern District of Ohio reasoned—and this Court agreed—that

> if Government agents come into a place of business and ask or demand to see files and records, and in a spirit of cooperation, the files and records are turned over to the agents by the business, it does not, in the opinion of this Court, constitute a voluntary turning over of records which can be claimed by the Government as a waiver.  There is at least an *implied coercion* in a request or demand made by Government agents.

---

[5]  Cases such as *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 675 (D.C. Cir. 1979), and its progeny are inapposite.  Those cases stand only for the limited proposition that "involuntary disclosures" due to the "loss or theft of documents from the attorney's possession" or another third party are not protected by privilege.  *Id.* (citation and internal quotation marks omitted).  This rule is based on the rationale that a client and his attorney must take appropriate precautions to prevent the privilege from being pierced.  *See id.*  Even *Ocean Transportation* recognized, however, that this rule "should not be strictly applied to all cases of unknown or inadvertent disclosure."  *Id.*  Indeed, one consideration identified by the Court that may militate against waiver is the "compelled" production of privileged documents by the government.  *Id.*

*Id.* (emphasis added and citation omitted).

This rule of decision—requiring waiver of the privilege to be made voluntarily—makes perfect sense and is entirely aligned with the bedrock rule of constitutional law that fundamental rights may not be waived unless done so voluntarily.  In fact, this Court has compared the attorney-client privilege to other fundamental constitutional protections, such as the right to counsel and the right of access to the courts.  *See Hicks v. Bush*, 452 F. Supp. 2d 88, 99 (D.D.C. 2006) (noting that the attorney-client privilege "has been associated with the constitutional right of prisoners to have access to the courts, including the right of a prisoner to communicate privately with his attorney") (citations omitted).  Indeed, a defendant pleading guilty may not waive the privilege against compulsory self-incrimination, the right to trial by jury, or the right to confront accusers, unless such waiver is "voluntarily made."  *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969); *see also Machibroda v. United States*, 368 U.S. 487, 493 (1962) (holding that "[a] guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void").  This Court has also uniformly required a voluntary act before it will find that a person or entity has waived fundamental procedural protections, such as the right to a presiding Article III judge, *see Morrison v. Int'l Programs Consortium, Inc.*, 205 F.R.D. 61, 64 (D.D.C. 2002), or the right to *Miranda* warnings, *United States v. Hammond*, 841 F. Supp. 421, 424 (D.D.C. 1993).

Additionally, it is well-established at common law, through the doctrine of "economic duress," that a person may not exploit the financial position of another party to extract "consent" to a fundamentally unfair contractual condition.  "[T]o prove economic duress a plaintiff must establish:  (1) a wrongful act or improper threat; (2) the absence of a reasonable alternative to entering the agreement; and (3) the lack of free will."  *Qualls v. Rumsfeld*, 412 F. Supp. 2d 40,

10

44 (D.D.C. 2006).  Therefore, at common law, financial exigency—which existed in this case at

the time Williams surrendered its privileged information to the government—alone, and without

more, is a sufficient predicate to a finding of involuntariness.  And, in this case, all these

conditions are easily met.  In 2002, due to a widespread lack of confidence in the energy

industry, Williams stood at the brink of bankruptcy.  On the heels of the much-publicized Enron

scandal, the bankruptcy of Williams' former telecommunications subsidiary, and various

lawsuits and regulatory investigations pending against the company, Williams' stock price

plummeted from a high of twenty dollars in December 2001 to a low of under one dollar in July

2002, and analysts downgraded its debt to below investment grade.  Under these circumstances,

an indictment was unthinkable.  The economic consequences may well have been catastrophic.

This is a classic case of economic duress.

      The common thread in these cases—and countless others—is that important legal rights

and protections similar to the attorney-client privilege and work-product doctrine may not be

waived when a person or entity is unable to make a meaningful, voluntary choice whether to

assert the privilege or right.

      Although Defendant argues against the "selective waiver" theory, the argument is

inapposite.  The D.C. Circuit—along with the majority of federal courts—has not endorsed a

"selective waiver" theory that would give parties the prerogative to waive the attorney-client

privilege with respect to some parties but not others.  *See Permian Corp.*, 665 F.2d at 1221.

Because the prohibition on involuntary waivers of fundamental rights has a well-established

history in common and constitutional law, this Court would not need to recognize a new

privilege to find that Williams' attorney-client and work-product protections remain intact.

Rather, Williams merely asks the Court to apply the well-established principle that *involuntary*

production of privileged information does not compromise the attorney-client privilege *at all*.
*See* Order, *Natural Gas*, at 2.

## III.    WILLIAMS' PRODUCTION OF ATTORNEY-CLIENT MATERIALS TO THE GOVERNMENT WAS INVOLUNTARY.

Whether waiver of the attorney-client privilege is voluntary is an inherently fact-specific inquiry. *See, e.g.*, *In re Sealed Case*, 877 F.2d at 981 (finding that "such determinations [as the scope of a privilege waiver] properly depend heavily on the factual context in which the privilege is asserted"). Consistent with this approach, faced with the facts at issue here, the California Superior Court that decided *Natural Gas* carefully considered all the facts relevant to the federal government's policy of conditioning a corporation's "full cooperation" with the government on relinquishing the attorney-client and work-product protections and concluded that the government's policies and tactics as applied to Williams were coercive. *See* Order, *Natural Gas*, at 2-3. In reaching this conclusion, the court carefully examined the long history of the government's policy—the Thompson and Holder Memoranda, the creation of a Corporate Fraud Task Force, the elimination of the waiver provision in the Sentencing Guidelines, the McNulty Memorandum, and the opinion of prominent commentators. *Id.* This Court should reach the same conclusion: Williams' production of its privileged information could not, as a matter of law, constitute a waiver of any privilege.

### A.     *The Government Has Historically Treated Cooperation as a Condition of Leniency.*

Federal investigators and prosecutors historically have had enormous discretion to investigate, institute enforcement proceedings, and seek indictments against corporate targets. *See, e.g.*, Richard S. Gruner, *Towards an Organizational Jurisprudence: Transforming Corporate Criminal Law Through Federal Sentencing Reform*, 36 ARIZ. L. REV. 407, 463-71 (1994). The government has often leveraged that discretion to obtain a corporation's

"cooperation" in serving the needs of the investigating or indicting agency.  *See*, *e.g.*, Ellen S.

Podgor, *White-Collar Cooperators:  The Government in Employer-Employee Relationships*, 23

CARDOZO L. REV. 795 (2002); George J. Terwilliger, *Corporate Criminal Investigations*, 40

NO. 1 PRAC. LAW. 61, 63 (1994).

In 1991, the United States Sentencing Commission became the first federal agency to

codify the importance of a corporation's "cooperation" with the government as a condition for

leniency.  *See* U.S. SENTENCING GUIDELINES MANUAL § 8C2.5 (1991).  Although the guidelines

did not expressly define cooperation, various United States Attorneys quickly made it known that

their notion of cooperation included the production of privileged materials.  *See* Tamara Loomis,

*Privilege Waivers:  Prosecutors Step Up Use of Bargaining Chips*, 224 N.Y.L.J. 5 (2000)

(stating that the U.S. Attorney's request for privileged materials began in the early 1990s); *see*

*also* Robert Morvillo, *The Decline of the Attorney-Client Privilege*, 18 N.Y.L.J. 3 (1997); Jed S.

Rakoff, *Coerced Waiver of Corporate Privileges*, 214 N.Y.L.J. 3 (1995).  Legal commentators

also confirmed that the new sentencing guidelines exerted considerable pressure on corporations

to produce privileged information.  *See* Lance Cole, *Revoking Our Privileges:  Federal Law*

*Enforcement's Multi-Front Assault on the Attorney-Client Privilege (And Why it is Misguided)*,

48 VILL. L. REV. 469, 538-41 (2003).

> **B.**     ***The Federal Government Conditioned Avoidance of Enforcement and***
> ***Criminal Prosecution Actions on Production of Privileged Information.***

In 1999, the DOJ, through a memorandum written by Deputy Attorney General Eric

Holder, expressly identified the production of privileged information as a factor that could be

considered in determining whether a corporation would be criminally prosecuted for the deeds of

its employees.[6]  The impact of the Holder Memorandum was pronounced.  Federal investigators

and prosecutors were emboldened to seek production of privileged information, and the requests

were accompanied by the implicit threat to the corporate target that non-compliance could be

deemed "uncooperative" in the eyes of the authority that would decide whether to indict the

target corporation.  As a result, corporations routinely succumbed to the pressure and produced

privileged information sought by the government.  *See* Lawrence D. Finder & Ryan D.

McConnell, *Devolution of Authority:  The Department of Justice's Corporate Charging Policies*,

51 ST. LOUIS U. L.J. 1, 10 (2006).  Corporations had become acutely aware that "[t]he possible

sanctions against the corporation if it is deemed to have failed to cooperate 'thoroughly' [were]

too great to justify a battle with prosecutors over privileges."  David M. Zornow & Keith D.

Krakaur, *On the Brink of a Brave New World:  The Death of Privilege in Corporate Criminal

Investigations*, 37 AM. CRIM. L. REV. 147, 156 (2000).

   In 2002, the federal government adopted a still more aggressive approach to pursuing and

investigating alleged corporate misdeeds, highlighted by the creation of the President's

Corporate Fraud Task Force (hereinafter the "Task Force").[7]  The Task Force was comprised of

the federal government's major commercial regulatory agencies, including the DOJ, the CFTC,

and the Federal Energy Regulatory Commission ("FERC").[8]  The Task Force, headed by Deputy

---

[6] Memorandum from Eric Holder, Deputy Att'y Gen., U.S. Dep't of Justice to Component
Heads and U.S. Attorneys on Bringing Criminal Charges Against Corps. (June 16, 1999),
U.S. Attorney's Manual, tit. 9, Criminal Resource Manual, art. 162, Federal Prosecution of
Corporations (2000), www.usdoj.gov/usao/eousa/foia_reading_room/usam/ [hereinafter the
"Holder Memorandum"].

[7] Exec. Order 13271, 67 Fed. Reg. 46,091 (July 9, 2002).

[8] *Id.*

Attorney General Larry Thompson, had as its primary purpose to "maximiz[e] cooperation and joint regulatory and enforcement efforts throughout the federal law enforcement community."[9] Importantly, at the same time that these agencies were escalating their investigative powers and efforts, they were also initiating their investigations against participants in the gas market, including Williams. In fact, Deputy Attorney General Thompson touted these investigations, which were proceeding more swiftly than pre-Task Force investigations, as evidence of the Task Force's effectiveness (CFTF Annual Report at iii), a result unquestionably achieved through the involuntary production of privileged information.[10]

On January 20, 2003, Deputy Attorney General Thompson memorialized the federal government's campaign against on the attorney-client privilege and work-product doctrine when he issued what has come to be called the Thompson Memorandum.[11] The Thompson Memorandum drew heavily on the efforts of the Task Force and was designed to advance the Task Force's mission by defining precisely what, in the government's mind, constituted cooperation by investigation targets:

> The main focus of the [Thompson Memorandum] is increased emphasis on and scrutiny of the authenticity of a corporation's cooperation. Too often business organizations, while purporting to cooperate with a Department investigation, in

---

[9] CORPORATE FRAUD TASK FORCE, FIRST YEAR REPORT TO THE PRESIDENT iii (2003), http://www.usdoj.gov/dag/cftf/first_year_report.pdf [hereinafter "CFTF Annual Report"].

[10] Deputy Attorney General Thompson specifically referred to the investigations by the CFTC and the FERC into allegations of price manipulation in the natural gas markets. *See* CFTF Annual Report at 3.32, 3.37.

[11] Memorandum from Larry Thompson, Deputy Att'y Gen., U.S. Dep't of Justice to Component Heads and U.S. Attorneys on Principles of Fed. Prosecution of Bus. Orgs. (January 20, 2003), http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm [hereinafter "Thompson Memorandum"].

> fact take steps to impede quick and effective exposure of the complete scope of wrongdoing under investigation. The [Memorandum] make[s] clear that such conduct should weigh in favor of a corporate prosecution.

Thompson Memorandum at 1. Thus, to gauge the "authenticity" of a corporation's "cooperation," the Department of Justice was explicitly required to consider "the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, *the waiver of corporate attorney-client privilege and work-product protection.*" *Id.* at 3 (emphasis added). The policies enunciated in the Thompson Memorandum were not limited to the Department of Justice, but were applicable to all members of the Task Force, including the CFTC and FERC, and were specifically incorporated into the Task Force's first annual report.[12]

The policies set forth in the Thompson Memorandum mirrored those that had been common practice for the CFTC. The CFTC had been considering a corporation's "cooperation" in determining whether, and to what extent, it would impose fines since 1994.[13] The applicable CFTC Enforcement Advisory sets forth "cooperation factors" that, if demonstrated, "would prompt the Division staff to recommend reduced sanctions to the Commission."[14] Among the considerations detailed by the CFTC Enforcement Advisory is the "Quality of the Company's Efforts in Cooperating with the Division and Managing the aftermath of the Misconduct." *See*

---

[12]  CFTF Annual Report at Appendix 1.

[13]  *See* CFTC Policy Statement Relating to the Commission's Authority to Impose Civil Money Penalties and Futures Self-Regulatory Organization's Authority to Impose Sanctions; Penalty Guidelines, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26, 265 (November 1994).

[14]  U.S. Commodity Futures Trading Commission, Enforcement Advisory, Cooperation Factors in Enforcement Division Sanction Recommendations (Aug. 11, 2004), http://www.cftc.gov/files/enf/enfcooperation-advisory.pdf.

Cooperation Factors, *supra* note 14, at 2.  Like the Thompson Memorandum's cooperation

provision, this includes whether "the company willingly:  (a) waived corporate attorney-client

and work-product protection for internal investigation reports and other corporate documents"

and "(b) waived corporate attorney-client privilege for employee testimony."[15]  In fact, in the

midst of the CFTC's investigation into the natural gas markets, the Director of the Division of

Enforcement, the specific division that was investigating Williams (and other participants) in the

gas misreporting cases, issued a press release expressly stating that the CFTC believed certain of

the defendants in these cases, who had yet to produce privileged information to the CFTC, were

not cooperating with the CFTC's investigation.[16]

Similarly, the FERC has also long treated "cooperation" as a critical factor in determining

the necessity and amount of sanctions to be levied against a corporate target.  The FERC

memorialized its practices in a Policy Statement on Enforcement that advises companies that

bona fide and timely cooperation in investigations will reduce the likelihood and amount of

sanctions against the company, and failure to cooperate could result in penalties against the

company and its agents.[17]  The FERC policies are modeled after, and expressly refer to, the

policies adopted by the Department of Justice in the Thompson Memorandum and by the

---

[15]  *Id*. at 2.

[16]  El Paso Trading Unit Agrees to Pay $20 Million to Settle CFTC Charges of Attempted
Manipulation and False Reporting, CFTC Release No. 4765-03 (March 26, 2003),
http://www.cftc.gov/opa/enf03/opa4765-03.htm (comments by the Director of the CFTC's
Enforcement Division).

[17]  U.S. Federal Energy Regulatory Commission, Policy Statement on Enforcement (Oct. 20,
2005), http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=10855343.

CFTC.[18]  As is true for those other agencies, FERC considers and determines the appropriate level of penalty based, in part, on the level of cooperation the investigation target demonstrates. It makes clear that "[n]o credit will be given if a company does no more than the minimum, . . . impedes the Commission's activities or consumes Commission resources unnecessarily."[19]

Following suit, the United States Sentencing Commission amended its Organizational Sentencing Guidelines to provide that production of privileged information would, in certain circumstances, be a prerequisite to leniency.[20]

**C.    *Companies Had No Choice:  They Had to Comply with the Government's Demands for Production of Privileged Information.***

In the wake of the Holder and Thompson Memoranda, an unprecedented surge in government demands for access to privileged communications and work product occurred.[21]

The government and the private sector agree that an indictment alone can spell the end of a corporation, which leaves corporations no choice but to "cooperate" and comply with the government's requests.  As the Assistant Attorney General of the Criminal Division noted, "you'll get a lot of credit if you cooperate, and that credit can make the difference between life

---

[18]  *Id.* at 4-5.

[19]  *Id.* at 12.

[20]  U.S. SENTENCING GUIDELINES MANUAL § 8C2.5 (2004).

[21]  *White Collar Enforcement (Part I):  Attorney-Client Privilege and Corporate Waivers Before the H. Comm. On the Judiciary Subcommittee on Crime, Terrorism, and Homeland Security*, 109th Cong. (2006) (testimony of William M. Sullivan, Jr. Esq., Partner, Winston & Strawn, LLP) [hereinafter "Hearing before the House Judiciary Comm."].

and death for a corporation."[22]  For example, in June 2002, Arthur Andersen—then one of the

"Big Five" accounting firms—was indicted for obstruction of justice for its destruction of Enron-

related documents.  The penalties for the charge were not exceptionally severe—a $500,000 fine

and five years of probation.  Nevertheless, the firm collapsed within months of its indictment.

Although the United States Supreme Court in a 9-0 decision overturned Arthur Andersen's

conviction, the damage was done.  *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 698

(2005).

Likewise, last year the securities class-action law firm of Milberg Weiss Bershad &

Schulman refused to cooperate with a government investigation and produce information

protected by the attorney-client privilege.  The firm was subsequently indicted, and within five

months of the indictment 40% of the firm's attorneys had defected.  Peter Elkind, *The Law Firm

of Hubris, Hypocrisy & Greed*, FORTUNE MAGAZINE, at 154 (Nov. 13, 2006).

Furthermore, a number of studies have found that there are drastic consequences for a

publicly-traded corporation's stock value when the government takes action against a

corporation.  Cindy R. Alexander, *On the Nature of the Reputational Penalty for Corporate

Crime:  Evidence*, 42 J. L. AND ECON. 489, 500 (1999); Sanjai Bhagat, *et al.*, *The Shareholder

Wealth Implications of Corporate Lawsuits*, 27 (Winter) FIN. MGMT. 5, 17 (1998).  These studies

have found that government action against a company causes an average decline in the market

---

[22] *See* Christopher A. Wray, Asst. Att'y Gen., Crim. Div., DOJ, Remarks at the A.B.A. White
Collar Crime Luncheon 3 (Feb. 25, 2005),
http://www.usdoj.gov/criminal/pr/speeches/2005/02/2005_3853_rmrkCrimLuncheon030205.
pdf.

price of the stock in the range of tens of millions of dollars.  *Id.*  Corporations also face a

negative impact on a company's public image and creditworthiness.[23]

In the time leading up to Williams' production of confidential information to the federal

government, Williams stood at the brink of bankruptcy, its debt rating was below investment

grade, and its stock price had suffered a roughly ninety-five percent diminution in value.  The

consequences of being labeled "uncooperative" for a company in such a precarious position

highlight the coercive impact of the government's policies especially as applied to Williams.

> **D.**    *A Wide Range of Authorities Agree that the Government's Investigatory Tactics Were Coercive.*

The adverse consequences that can result from failing to comply with the government's

demand for privileged information, or from being labeled "uncooperative," have led a wide

range of prominent authorities to recognize that the investigative tactics employed by the

government in cases such as this were inherently coercive.  One federal district court, comparing

the government's tactics to holding the proverbial "gun" to a corporate defendant's "head," held

that the government's tactics were coercive and declared the Thompson Memorandum in certain

respects to be unconstitutional.  *See United States* v. *Stein*, 435 F. Supp. 2d 330, 335-36

(S.D.N.Y. 2006).  *Stein* involved the government's attempt to coerce KMPG to cease paying the

attorney's fees of certain of its employees who had been indicted.  Whether a corporation paid

the attorney's fees of its employees, like the production of privileged information, was identified

in the Thompson Memorandum as a factor to be considered in determining whether to indict the

---

[23] *The Thompson Memorandum's Effect on the Right to Counsel in Corporate Investigations: Hearing Before the Sen. Jud. Comm.*, 109th Cong. 22-24 (September 12, 2006) (statement of Karen Mathis, President, American Bar Association).

corporation.  District Judge Kaplan focused on the influence of the Thompson Memorandum

from the perspective of the corporation and its defense counsel:

> Few if any competent defense lawyers would advise a corporate client at risk of
> indictment that it should feel free to advance legal fees to individuals in the face
> of the language of the Thompson Memorandum itself.  It would be irresponsible
> to take the chance that prosecutors might view it as "protecting . . . culpable
> employees and agents."  As KPMG's new chief legal officer, former U.S. District
> Judge Sven Erik Holmes, testified, he thought it indispensable (as would any
> defense lawyer) "to be able to say at the right time with the right audience, we're
> in full compliance with the Thompson Memorandum."

*Id.* at 364 (citation omitted).  The court noted that any suggestion by a federal investigative

agency that waiving certain foundational legal protections may help a company stave off

indictment is inherently coercive.  In doing so, Judge Kaplan acknowledged the reality of the

government's approach embodied in the Thompson Memorandum:  corporations have no choice

but to comply.

Prominent former Justice Department officials, including former United States Attorneys

General Griffin B. Bell, Edwin Meese III, and Richard L. Thornburgh, and former Solicitors

General Theodore B. Olson and Kenneth W. Starr, have also recognized that the government's

tactics amount to an attempt to coerce the production of privileged information.  In a letter to

Attorney General Alberto Gonzalez, these officials wrote, "In practice, companies who are all

aware of the policies outlined in the Thompson Memorandum have no choice but to waive these

[attorney-client and work-product] protections.  The threat of being labeled 'uncooperative'

simply poses too great a risk of indictment to do otherwise."[24]

---

[24]  Letter from 10 Former Senior Department of Justice Officials to Attorney General Alberto
Gonzalez 1 (September 5, 2006),
http://www.abanet.org/buslaw/attorneyclient/materials/065/065.pdf.

The American Bar Association went so far as to create a special task force whose sole mission was to confront what its former president called the "misguided" policy of the federal government to coerce the production of privileged materials.  *See* Michael Greco, *U.S. Department of Justice Should Rethink Policy of Coercing Waiver of Attorney-Client Privilege*, Opinion Editorial by ABA President Michael S. Greco Issued April 17, 2006; Press Release, American Bar Association, *ABA President Robert Grey Creates Task Force to Advocate for Attorney-Client Privilege*, Oct. 6, 2004.  Numerous other organizations, including the Conference of Chief Justices, the American Civil Liberties Union, and the United States Chamber of Commerce, have all recognized and actively sought to curb the government's tactics.  *See* Sarah Helene Duggin, *The Impact of the War Over the Corporate Attorney-Client Privilege on The Business of Am. Health Care*, 22 J. CONTEMP. HEALTH L. & POL'Y 301, 302 (2006).  Even the author of the Thompson Memorandum recently conceded that the government's tactics have gone farther than he anticipated.  *See* Lynnley Browning, *Former Deputy at Justice Dept. Would Limit Legal Disclosure*, N.Y. TIMES, Dec. 1, 2006, at C6 (acknowledging that requests for privileged information should be "extremely limited").

Putting to rest any further debate, the federal government has effectively conceded that its policies were indeed coercive through recent administrative and proposed legislative changes expressly designed to curb the practice of demanding a waiver of privilege.  The United States Sentencing Commission recently voted to eliminate the provision in the commentary to the Organizational Sentencing Guidelines pertaining to consideration of production of privileged information as a condition for exercising leniency in sentencing.  U.S. SENTENCING GUIDELINES MANUAL § 8C2.5 (2006).  Similarly, both chambers of Congress have held hearings to address the government's tactics.  On March 7, 2006, the House Subcommittee on Crime, Terrorism, and

Homeland Security held hearings to address concerns "that the Department of Justice is coercing corporations to waive the attorney-client privilege during criminal investigations."[25]  The Subcommittee heard from former Attorney General Richard L. Thornburgh, who testified on behalf of several former Attorneys General supporting the end of the government's requests for waivers of the attorney-client and attorney work-product protections in connection with corporate investigations.[26]  The congressional panel welcomed and concurred with the concerns that corporate targets were being coerced to produce privileged information.[27]  On September 12, 2006, the Senate Judiciary Committee conducted hearings to address the same issue.  Former Attorney General Edwin Meese III testified at the hearing that the government's tactics, sanctioned by the Thompson Memorandum, were indeed coercive, threatened foundational principles of American jurisprudence, and undermined compliance with the law.[28]  The former Attorney General called on the government to "eliminate any reference to waiver of attorney-client privilege or work-product protections in the context of determining whether to indict a business organization."[29]

---

[25]  *See* Hearing before the House Judiciary Comm., *supra* n. 21 (statements of Congressman Robert C. Scott, ranking member of the Subcommittee on Crime, Terrorism, and Homeland Security).

[26]  *Id.* (testimony of the Honorable Richard L. Thornburgh).

[27]  *See generally id.* (statements of congressional panel).

[28]  *The Thompson Memorandum's Effect On the Right to Counsel in Corporate Investigations: Hearing Before the Sen. Jud. Comm.*, 109th Cong. 18-19 (September 12, 2006) (statement of Edwin Meese III).

[29]  *Id.*

On December 7, 2006, Senator Arlen Specter, the Chairman of the Senate Judiciary

Committee, introduced legislation titled the "Attorney-Client Privilege Protection Act of 2006."

*See* The Attorney-Client Privilege Protection Act, S. 30, 109th Cong. § 2(b) (2006) (hereinafter

the "Act").[30]  According to Senator Specter, the "consideration of the 'value of a corporation's

cooperation,' in charging . . . is coercive."[31]  The proposed legislation expressly prohibits any

agent or attorney of the United States in any civil or criminal federal investigation from

demanding, requesting or conditioning treatment on a company's production of privileged

information.  *Id.* at § 3014(b).

DOJ's reversal of policy occurred in December 2006.  On December 12, 2006, in the face

of a cascade of criticism and proposed legislation, the United States Department of Justice

abandoned the Thompson Memorandum.  Its successor, referred to as the "McNulty

Memorandum," is designed to address the concerns raised by Judge Kaplan, Congress and the

legal community.  The McNulty Memorandum removes production of privileged information

from the list of factors prosecutors may consider in determining whether to charge a

corporation.[32]  In fact, acknowledging the coercive nature of the prior regime, the McNulty

Memorandum expressly states that "[w]aiver of attorney-client and work product protections is

---

[30]  The title of the Act was updated and the bill was reintroduced as S. 186, the "Attorney-Client
Privilege Protection Act of 2007," on January 4, 2007, without any substantive changes.  *See*
The Attorney-Client Privilege Protection Act of 2007, S. 186, 110th Cong. (2007),
http://www.thomas.gov/cgi-bin/query/z?c110:S186:.

[31]  *Supra* n. 28 (statements of Senator Arlen Specter).

[32]  Memorandum from Paul J. McNulty, Deputy Attorney General, on Principles of Federal
Prosecution of Business Organizations to heads of Department Components, United States
Attorneys (December 12, 2006), http://www.usdoj.gov/dag/speech/2006/mcnulty_memo.pdf.

not a prerequisite to a finding that a company has cooperated in the government's investigation." *Id.* at VII.B.(2). This retreat from the policies under which investigations were conducted between 1999 and the issuance of the McNulty Memorandum acknowledges that the government's investigative tactics were unduly harmful to corporations. Of course, the McNulty Memorandum postdated the Williams issues by four years.

## IV.   WILLIAMS PRODUCED PRIVILEGED MATERIALS TO THE GOVERNMENT INVOLUNTARILY.

In October 2002, the CFTC issued a subpoena *duces tecum* to Williams demanding the production of documents and other material. Days later, in early November 2002, the District Court for the Northern District of California issued a grand jury subpoena to Williams. The CFTC, DOJ, and USAO were not "friendly" agencies with whom Williams was dealing. *Permian Corp.* , 665 F.2d at 1221. And, these agencies made clear that they wanted certain of Williams' confidential attorney-client and attorney-work-product materials.

On November 25, 2002, the CFTC stated its belief that Williams was failing to "fully cooperate with its investigation" and simultaneously issued a second subpoena to Williams. Letter from Steven Ringer, CFTC, to Williams, Nov. 25, 2002 (attached as Exhibit C). The CFTC explicitly told Williams that it demanded "full cooperation," including, "among other things, disclosing the results of . . . Williams' own internal investigations." *Id.* Indeed, the CFTC's November 25, 2002 subpoena explicitly demanded, *inter alia*, all investigative reports, files, notes, memoranda, audio recordings, witness statements and/or summaries of those statements, and documents related to any internal investigation or inquiry conducted by Williams. *See* Goldberg Declaration at ¶ 7. On November 27, 2002, the CFTC wrote that it was "frustrated and disappointed with [Williams'] decision not to turn over" its internal investigative files, in particular the Privileged Attorney Notes. Letter from Steven Ringer, CFTC, to

Williams, Nov. 27, 2002 (attached as Exhibit D).  The CFTC renewed its requests for the

Privileged Attorney Notes several times thereafter.  Throughout, the CFTC's message was clear:

cooperate or risk the consequences.

Federal Prosecutors, particularly the USAO, were also clear that they wanted—and

wanted promptly—material from Williams' internal investigation, including the Privileged

Attorney Notes.  *See* Goldberg Declaration at ¶ 8.  Federal Prosecutors were not shy about

stating that the production of these notes was an essential component in how prosecutors would

judge cooperation, which in turn would impact their decision whether to seek an indictment.  *See*

*id.* at ¶¶ 6, 12.

Williams did not turn over any privileged or work-product material until—on January 20,

2003—DOJ promulgated the Thompson Memorandum.  Faced with this new policy, which

formalized the prosecutor's demands, there was no longer any doubt that producing attorney-

client and work-product-protected materials was essential to establishing cooperation, which in

turn weighed heavily in the government's charging decision.  The result of these repeated, multi-

front, and coercive tactics was that on April 25, 2003—only four months after the DOJ issued the

Thompson Memorandum and while the principles articulated in the Thompson Memorandum

were at their zenith—Williams relented to the government's demands and involuntarily turned

over the Privileged Attorney Notes to the USAO.  *See id.* at ¶ 8; *see also* Letter from Williams to

Federal Prosecutors, Apr. 25, 2003 (attached as Exhibit E).  In doing so—and demonstrating the

tactics employed by Federal Prosecutors and the Hobson's choice Williams faced—Williams

made clear that its decision to release the Privileged Attorney Notes was based wholly on the

government's representation that such a course of action would help the company avoid

indictment and the fated consequences it would bring.  In a letter addressed to Federal

Prosecutors and the CFTC, dated April 23, 2003, two days prior to Williams' production of

privileged information, Williams wrote:

> Williams has accepted in good faith your representation that the company's
> cooperation will play a significant role in the decision about prosecution.  We
> trust that its waiver of the attorney work product privilege and its willingness to
> forgo legitimate investigative needs demonstrate Williams' commitment to
> working with your office and will be reflected in a charging decision.

Letter from Williams to Federal Prosecutors, Apr. 23, 2003 (attached as Exhibit F).

In its letter accompanying the production, Williams demonstrates that it took every effort

to protect the privileges associated with these materials.  The letter states only that the production

was a "limited waiver of the attorney-work product protection, limited to these notes, the grand

jury investigation by the Department of Justice, and specifically, the investigation of natural gas

price reporting issues."  Letter from Williams to Steven Ringer, CFTC, May 7, 2003 (attached as

Exhibit G) (hereinafter "Williams Letter").  Furthermore, the terms of the agreement make clear

that Williams still viewed the produced material to be confidential, privileged, work product with

respect to the rest of the world.  Williams stated that it "expressly reserved and did not waive any

privilege and protection with respect to any other document and any other subject matter.

Further, we expressly reserved and did not waive any privilege and protection for these

documents as to any other action, investigation, case, matter or party."  *Id.*  As the DOJ

affirmatively represents to the Court, "[a]ttorneys for the government, in conversations with

Williams' counsel and in accepting these materials, agreed to these terms."  DOJ Brief at 6.

On May 7, 2003, Williams produced its Privileged Attorney Notes, this time to the

CFTC.  Williams did so under an express non-waiver agreement virtually identical to the one

detailed above, but with heightened protections given the CFTC's inability to protect the notes

under the grand-jury-secrecy rules of Federal Rule of Criminal Procedure 6(e).  Accordingly, as

agreed by the parties, the CFTC would "not copy these documents" and would "promptly . . .

27

return them upon [its] review." Williams Letter (attached as Exhibit G). In *Permian Corp.* — and unlike the situation here—the Court found it to be significant that the company in that matter had not secured from the SEC an explicit understanding that it was "forbidden" to release the confidential company information to other government agencies. 665 F.2d at 1217. Here, of course, Williams' non-waiver agreement with the CFTC contains such an understanding, as does its agreement with the DOJ, as evidenced by Williams' reference to "the grand jury investigation by the Department of Justice," which brings the agreement under the parameters of grand-jury-secrecy rules. Williams Letter (attached as Exhibit G). And, as agreed to by the parties, Williams' "sending these documents to [the CFTC] for [its] review shall not be deemed in any way to expand the limited waiver associated with our production of these documents to the Department of Justice." Williams Letter (attached as Exhibit G). Indeed, because Williams always viewed these notes to be privileged and confidential, on two separate occasions, July 22, 2003 and March 11, 2004, Williams requested the CFTC return its Privileged Attorney Notes. Letters from Edward Davis to CFTC, Jul. 22, 2003, Mar. 11, 2004 (attached as Exhibit H).

On July 14, 2003 and July 23, 2003, Williams produced additional Privileged Attorney Notes to the USAO. *See* DOJ Brief at 7. These productions were made under express non-waiver agreements identical to the agreement of April 25, 2003 detailed above. *Id.* At the repeated demand of the USAO, Williams subsequently produced its Privileged Data Analysis to the USAO under a non-waiver agreement. Indeed, as acknowledged by the DOJ, whenever "Williams produced any attorney-generated materials, these same conditions of production [as set forth in the April 25, 2003 non-waiver agreement] were explicitly stated and agreed to by attorneys for DOJ." *Id.* This understanding, of course, applied to the Privileged Presentations.

28

Given the facts of this case, there can be little doubt that the Federal Prosecutors and the CFTC created a situation that offered Williams no alternative but to involuntarily produce privileged, work-product materials, including the Privileged Attorney Notes, [33] Privileged Data Analysis, and Privileged Presentations. Williams surrendered these materials to federal authorities under the threat and fear of indictment and the draconian consequences an indictment would bring upon the company (especially one then as financially weak as Williams), its shareholders, and its employees. The circumstances of Williams' production of privileged materials were, in the words of the D.C. Circuit, "extraordinary circumstances." *In re Sealed Case*, 877 F.2d 980. The attorney-client privilege, therefore, was not—and could not be— waived.

## V.    WILLIAMS DID NOT WAIVE ITS WORK-PRODUCT PROTECTIONS.

Even the Defendant implicitly recognizes that to constitute waiver, Williams' productions must have been voluntary. Defendant's entire thesis for obtaining Williams' privileged and confidential work product is that Williams voluntarily disclosed these materials to the government. *See* Defendant's Brief at 9 ("Williams waived any work-product protection regarding information it *voluntarily* disclosed to the Government as part of its cooperation and its efforts to dissuade the Government from prosecution . . . ") (emphasis added); *see also*

---

[33] Defendant's request for the Privileged Attorney Notes are particularly inappropriate and unnecessary because as evidenced by Defendant's Rule 17 subpoena—which identifies a comprehensive list of 22 witnesses of interest to Defendant—Defendant already knows the identity of potential witnesses. Accordingly, Defendant is "free to question the employees who communicated with . . . counsel" rather than "secure the results of [the privilege holder's] internal investigation by simply subpoenaing the . . . notes taken by [the privilege holder's] attorneys." *Upjohn*, 449 U.S. at 396 (explaining that "considerations of convenience do not overcome the policies served by the attorney-client privilege"). And, lest there be any doubt of the identify of the witnesses interviewed by Williams during the course of its investigation, Defendant could easily request that DOJ compile such a list for him.

Defendant's Reply Brief at 2 ("It is simply inconsistent with the purpose of the protection for Williams to *voluntarily* disclose work-product to one adversary, the Government, and later to attempt to shield it from others.") (emphasis added); *id.* at 3 ("Williams' disclosures of its attorney work product were *voluntary*.") (emphasis added).[34]

However, as set forth in detail above, *see* Section IV, Williams' production of its privileged and work-product material was anything but voluntary; it was involuntary. Indeed, Judge Prager found no waiver of the work product doctrine. *See* Order, *Natural Gas*, at 2. Under such circumstances, the D.C. Circuit has held that work-product material may be protected. *See In re Subpoenas Duces Tecum*, 738 F.2d at 1373 ("[T]here may be less reason to find waiver in circumstances of involuntary disclosure."). Indeed, because Williams' productions were made pursuant to CFTC and grand jury subpoenas—a fact acknowledged by DOJ, *see* DOJ Brief at 10, and evidenced in the transmittal letters accompanying production to the USAO and CFTC—case law from this Circuit suggests that there may well be a presumption of involuntariness. *See In re Subpoenas Duces Tecum*, 738 F.2d at 1373 ("The distinction between voluntary disclosure and disclosure by subpoena is that the latter, being involuntary, lacks the self-interest which motivates the former."). The court in *In re Subpoenas Duces Tecum* placed much emphasis on the *voluntary* nature of the company's disclosures to the SEC under the "voluntary disclosure program" in finding that work-product protection had been waived, *see*

---

[34] Defendant contends that Williams failed to move to "quash the subpoenas, which it had the right to do, and which it should have done if it sought to avoid blanket waiver." Defendant's Reply Brief at 3. Defendant's assertion shows a lack of appreciation for the critical situation faced by Williams in the government's gas misreporting investigation. Williams was fighting for its corporate life, and was therefore in no position to challenge the government. Williams had no real choice; it could not challenge a subpoena—it had to comply with it and waive privilege in the process as the price for securing its corporate future.

*id.* at 1369, 1372-75, circumstances entirely absent here.  Accordingly, the foundational principle

by which Defendant argues for waiver is flawed both as a matter of law and fact.

Furthermore, contrary to Defendant's suggestion, the fact that Williams' deferred

prosecution agreement with the United States contains a waiver clause does not alter the

analysis.  *See* Defendant's Motion at 6.  First, Williams and the United States entered into a

Deferred Prosecution Agreement (hereinafter "DPA") on February 21, 2006, nearly three years

after Williams turned over privileged information to the federal government.  *See* DPA (attached

as Exhibit I).  Therefore, the DPA does not speak to the parties' understanding and state of mind

at the time of the involuntary release in 2003.  Second, the terms of the DPA itself require waiver

of the attorney-client and work-product protections only with respect to *future requests* made by

the federal government for privileged information, not past productions.  *See* DPA ¶ 6(a)

(agreeing to "[c]ompletely and truthfully disclos[e] all information as *may be requested* by the

Fraud Section" of the DOJ) (emphasis added); *id.* at ¶ 6(c) (agreeing not to assert attorney-client

or work-product protections with respect to any material "requested" by the federal government).

Third, even assuming that the DPA covers past productions of privileged information, the

agreement contains an express exception to the waiver for the "opinions of counsel, mental

impressions of counsel, communications between counsel, or lawful advice of counsel."  *Id.* at

¶ 6(c).  The interview notes prepared by Williams in response to the government's investigation

undoubtedly contain counsel's opinions, mental impressions, and lawful advice, and therefore

fall squarely within the language of the DPA, safeguarding such materials from involuntary

production.  Fourth, and finally, the DPA explicitly states that "[n]othing . . . in this Agreement

is intended or shall operate as a waiver of [Williams'] rights under Federal Rule of Evidence

408," which at the time protected all statements made in compromise negotiations with the

government from admission by a third party.  *Id.* at ¶ 4.  Far from requiring production of privileged information to third parties, the DPA explicitly prohibits it.

In any event, "the work product privilege is not automatically waived by *any* disclosure to a third party."  *In re Sealed Case*, 676 F.2d at 809 (emphasis added); *see also Permian Corp.*, 665 F.2d at 1219 (the "mere showing of a *voluntary* disclosure to a third person . . . should *not* suffice in *itself* for waiver of the work product privilege") (emphases added) (quoting *AT&T*, 642 F.2d at 1299).  Rather, the inquiry "with respect to implied waiver [of the work-product protection] is whether Wigmore's 'objective consideration' of fairness negates [the] assertion of privilege."  *In re Subpoenas Duces Tecum*, 738 F.2d at 1371 (internal quotations omitted) (second alteration in original).  This standard contains three objective considerations.  First, the Court must consider whether "the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege."  *Id.* at 1372 (internal quotations and citations omitted).  Second, the party asserting the privilege must have "no reasonable basis for believing that the disclosed materials would be kept confidential" by the government.  *Id.*  Third, and finally, the "waiver of the privilege in [the] circumstances [of the case must] . . . not trench on any policy elements now inherent in this privilege."  *Id.*  In this case, all three factors compel a finding of non-waiver.

Williams expressly incorporates and adopts the DOJ's analysis regarding non-waiver of work-product protection as it applies to the Privileged Attorney Notes, Privileged Data Analysis, and Privileged Presentations.  *See* DOJ Brief at 8-14.  Accordingly, Williams will not repeat that analysis again.  There are, however, additional considerations that further compel a finding of non-waiver, which Williams addresses here.  Also, Defendant has raised several arguments in his Reply Brief that warrant response.

32

In *In re Subpoenas Duces Tecum*, the court implied that a company's insistence on confidentiality before production of privileged information is a factor that favors an application of the work-product doctrine. 738 F.2d at 1375. Contrary to Defendant's unsupported suggestions, *see* Defendant's Reply Brief at 3, the interview notes generated by Williams' counsel that are the subject of this dispute were created in response to the CFTC and grand jury subpoenas issued by government authorities. Williams provided the DOJ and CFTC these attorney witness interview notes under express non-waiver agreements, by which both governmental entities acknowledged that Williams expressly reserved—and did not waive—any privilege for these notes as to any other party. *See* Goldberg Declaration at ¶¶ 8-9. The Privileged Data Analysis prepared by Williams through and under the supervision of its attorneys were also produced under another express non-waiver agreement. *See id.* at ¶ 10. Indeed, all privileged, work product materials were produced under these conditions. DOJ Brief at 7. Accordingly, Williams had every reason to believe that the confidentiality of its privileged, work-product documents would be maintained especially since its productions were made in response to a grand jury subpoena.[35]

The reasonableness of Williams' expectation of confidentiality is further acutely demonstrated by the fact that the government is opposing production of Williams' privileged documents. Williams and the DOJ had an agreement that the documents given to the DOJ would be held in confidence and not shared with others. Williams had no reason to believe that the government would not live up to its end of the bargain. To the contrary, as the current dispute

---

[35] The request for documents produced pursuant to a grand jury subpoena and prepared in connection with a grand jury investigation implicates grand jury secrecy concerns under Federal Rule of Criminal Procedure 6(e). Williams reserves the right to address the grand jury secrecy objection, as well as all other applicable objections, at a later date, if needed.

illustrates, the government is affirmatively and actively seeking to meet its obligations.  Were

Williams' expectation of confidentiality as wholly unreasonable as Defendant suggests, it stands

to reason that the government would simply produce the documents at issue and spare itself the

time and resources necessary to litigate the issue.

Williams' expectation of confidentiality was also reasonable because "confidential

settlement communications are a tradition in this country."  *Goodyear Tire & Rubber Co. v.*

*Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003).  Indeed, at least one federal court

of appeals has created a formal "settlement privilege" that protects communications in

furtherance of settlement negotiations from discovery by third parties in a separate action.  *See*

*id.* at 979.  In creating the privilege, the Sixth Circuit reasoned that "[p]arties are unlikely to

propose the types of compromises that most effectively lead to settlement unless they are

confident that their proposed solutions cannot be used . . . by some future third party."  *Id.* at

980.  Although this Circuit has not yet adopted a formal "settlement privilege,"[36] the

longstanding policy in favor of confidentiality in settlement negotiations and the strong federal

policy in favor of settlement illustrate the fundamental reasonableness of Williams' expectation

that its work product would be protected from third-party discovery.

Finally, as described in detail *supra*, Section IV, Williams involuntarily produced the

documents that are at issue here.  Thus, Williams did not act with an appropriate level of self-

interest.  *See In re Subpoenas Duces Tecum*, 738 F.2d at 1373.  Indeed, the government concedes

---

[36]  *See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d
740, 755 (D.C. Cir. 2006) (noting that the question of whether a federal settlement privilege
exists "remains open in [the D.C.] [C]ircuit."); *In re Subpoena Issued to Commodity Futures
Trading Comm'n*, 370 F. Supp. 2d 201, 212 (D.D.C. 2005) ("declin[ing] plaintiffs' invitation
to recognize a federal settlement privilege."), *aff'd in part on other grounds*, 439 F.3d 740
(D.C. Cir. 2006).

that production of privileged information pursuant to subpoena is involuntary and therefore the work-product rule should protect interview notes Williams produced pursuant to grand jury subpoena.  *See* DOJ Brief at 10.

*     *     *

This Court should hold that the attorney-client and work-product protections apply to the privileged information that Williams involuntarily produced to the federal government.  The California Superior Court for San Diego County has already decided the issue:  Williams never surrendered its privileges because it involuntarily produced materials to the federal government that it desired to keep confidential.

As the government makes clear, there is no exculpatory information in these materials.  *See* DOJ Brief at 13-14.  Therefore, Williams' strong interest in preventing discovery of its highly sensitive and privileged materials far outweighs the Defendant's hypothetical interest in using these documents at his trial.[37]

---

[37] Given the sensitivities and sanctity of the materials at issue, if necessary to the Court's resolution of Defendant's motion, Williams would respectfully request that this Court conduct an *in camera* review of the Privileged Attorney Notes, Privileged Data Analysis, and Privileged Presentations for relevance and admissibility.

## <u>CONCLUSION</u>

Based on the foregoing and for such other reasons as the Court may deem appropriate,

Defendant's Motion to Compel should be denied.

Respectfully Submitted,

Dated:  June 7, 2007

/s/ F. Joseph Warin
F. Joseph Warin (D.C. Bar No. 235978)
  *Counsel of Record*
Peter E. Jaffe
Andrew S. Boutros

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorneys for The Williams Companies, Inc.*
*and Williams Power Company, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2007 I caused a copy of the foregoing APPLICATION

FOR RELIEF PURSUANT TO LCrR 57.6 IN UNITED STATES v. SCOTT THOMPSON

(1:06-cr-00288-RJL-1) to be delivered by e-mail and first class mail to the following counsel:

| | |
|---|---|
| Philip T. Inglima, Esq. | Robertson Park, Assistant Chief |
| Adrian D. Mebane, Esq. | Amanda L. Riedel, Trial Attorney |
| Ann M. Mason, Esq. | Criminal Division |
| CROWELL & MORING LLP | United States Department of Justice |
| 1001 Pennsylvania Avenue, N.W. | Bond Building |
| Washington, D.C. 20004 | 1400 New York Avenue, N.W. |
| *Counsel for Scott Thompson* | Washington, D.C. 20005 |
| | *Counsel for the United States of America* |

/s/  Andrew S. Boutros
Andrew S. Boutros
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

EXHIBIT A

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SAN DIEGO
CENTRAL

## MINUTE ORDER

Date: 05/16/2007                          Time: 10:00:00 AM          Dept: C-71

Judicial Officer Presiding: Judge Ronald S. Prager

Clerk: Kathleen Sandoval

Bailiff/Court Attendant: S. Parriot

ERM:

Reporter: Peter C. Stewart
Case Init. Date: 12/03/2001
Case No: JCCP4221                    Case Title: JCCP4221 COORDINATION PROCEEDING NATURAL
                                      GAS ANTI-TRUST CASES

Case Category: Civil - Unlimited      Case Type: Antitrust/Trade Regulation

Event Type: Discovery Hearing

Appearances:

The Court, having taken the above-entitled matter under submission on 05/18/2007 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

RULING AFTER ORAL ARGUMENT: The Court rules on Independent Plaintiffs et al. (collectively "Plaintiffs") McKesson motion to compel against defendants Aquila Merchant Servs., Inc. et al. (sometimes collectively "Defendants") re privileged documents provided to third parties as follows:

Based upon the arguments of the parties presented at the hearing, the Court affirms its tentative ruling.

Request for Judicial Notice. Plaintiffs' quest for judicial notice of documents filed with their reply brief is granted, absent an objection from Defendants at oral argument on due process grounds.

Plaintiffs' Evidentiary Objections. The Court rules as follows with respect to the evidentiary objections to portions of the following declarations:

Aquila: The objections to (1) paragraph 2, (2) paragraph 4, lines 22-1, (3) paragraph 5, (4) paragraph 7, lines 17-23 and paragraph 8, lines 2-4, (5) paragraph 9, lines 7-9, 11, (6) paragraph 10, lines 18-20, (7) paragraph 12, lines 5-10, (8) paragraph 13, lines 16-20, (9) paragraph 14, lines 25-1, and (10) paragraph 18, lines 9-15 of the Uffelman Declaration are overruled.

The objections to (1) paragraph 6, lines 6-8, (2) paragraph 8, lines 26-28, (3) paragraph 8, lines 2-4, (4) paragraph 9, lines 11-13, (5) paragraph 10, lines 14-16, (6) paragraph 11, lines 22-25, (7) paragraph 12, lines 1-3, (8) paragraph 13, lines 7-10, and (9) paragraph 14, lines 22-23 of the Weiss Declaration are overruled.

Coral: The objections to (1) paragraph 4, lines 22-25, (2) paragraph 9, lines 24-6, and (3) paragraph 10, lines 7-10 of the Tuohey Declaration are overruled.

Duke: The objections to (1) paragraph 3, lines 12-23, (2) paragraph 4, lines 3-14, (3) paragraph 5, lines 18-1, (4) paragraph 6, lines 4-15, (5), paragraph 7, lines 16-23, (6) paragraph 8, lines 24-1, (7) paragraph 9, lines 4-9, (8) paragraph 9, lines 9-11, (9) paragraph 10, (10) paragraph 11, (11) paragraph 12, and (12) paragraph 13 of the Trent Declaration are overruled.

Dynegy: The objections to (1) paragraph 3, lines 11-13 and (2) paragraph 4 of the Williamson Declaration are overruled.

The objections to (1) paragraph 4, lines 19-23, (2) paragraph 4, lines 23-27, (3) paragraph 5, lines 1-5, and (4) paragraph 5, lines 5-8 of the Buchman Declaration are overruled.

Williams: The objections to (1) paragraph 3, lines 6-8, (2) paragraph 4, (3) paragraph 5, (4) paragraph 6, lines 1-5, (5) paragraph 7,

lines 7-16, and (6) paragraph 12, lines 14-16 and 21-22 of the Goldberg Declaration are overruled.

As a preliminary matter, it is noted that the noticed motion was limited to the waiver issue. (See Plaintiffs' Notice of Motion, p. 2, ll. 1-4 ("Said motion will be made...on the grounds that Defendants have waived any privileged or attorney work protection they may have had by producing the documents at issue to third parties") and Plaintiffs' P&A, pp. 1, ll. 2-6 and 11, ll. 22-25 ("the only objections at issue in this motion are those based on privilege and attorney work product.") The Court cannot grant different relief, or relief on different grounds than the relief requested in Plaintiffs' Notice. (Taliaferro v. Riddle (1959) 167 Cal.App.2d 567, 570 and Luri v. Greenwald (2003) 107 Cal.App.4th 1119, 1124.)

The motion to compel is denied for the reasons stated below.

Evidence Code section 912 subd. (a) provides that the privilege "is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone." Waiver of the work product doctrine is not expressly defined by statute but is generally found under the same set of circumstances as waiver of the attorney-client privilege. (McKesson HBOC, Inc. v. Super. Ct. (2004) 115 Cal.App.4th 1229, 1239 (hereafter "McKesson").)

Plaintiffs argue that Defendants waived the privilege by disclosing documents and information to the government pursuant to McKesson. Defendants, on the other hand, contend, that there was no waiver since the disclosures to the government were coerced.

In McKesson, the court held that McKesson waived the attorney-client privilege and work product protection with respect to documents it shared with the government pursuant to confidentiality agreements. (Id. at pp. 1232-1234.) Importantly, the court noted that McKesson voluntarily consented to the disclosure of the privileged information. (Id. at p. 1236.) Thus, unlike the defendants in this case, McKesson did not argue that it was coerced into producing the privileged documents.

Interestingly, the cases from other jurisdictions that Plaintiffs cited in support of their motion state that cases involving voluntary disclosure are distinguishable from cases in which there was coercion. (See In re Steinhardt Partners, L.P. (2nd Cir. 1993) 9 F.3d 230, 234 (hereafter "In re Steinhardt Partners") and In re Subpoena Dues Tecum (1984) 738 F.2d 1367, 1373.) In these cases, the courts noted that the privileged documents were voluntarily disclosed since there was no allegation that the government agency involved coerced or required compliance in any way. (Ibid.; See also In re Qwest Comms. Internat., Inc. (10th Cir. 2006) 450 F.3d 1179, 1182 fn. 1 (hereafter "In re Qwest").) Furthermore, the courts in In re Steinhardt and In re Subpoena Duces Tecum specifically declined to adopt a per se rule that all voluntary disclosures to the government waived the privilege and stated that the crafting of rules relating to privilege with respect to governmental investigations must be done on a case-by-case basis. (See In re Steinhardt Partners, supra, 9 F.3d at p. 234 and In re Qwest, supra, 450 F.3d at pp. 1191-1192.) More importantly, the court in In re Qwest rejected the "culture of waiver" argument presented by amici curiae due to the sparseness of the record on that issue particularly with respect to Qwest's dealings with the agencies and whether it experienced the tactics deplored by amici. (See In re Qwest, supra, 450 F.3d at p. 1199.)

As noted above, section 912 subd. (a)'s states that a waiver must not be coerced. Neither McKesson nor the persuasive authority noted above from other jurisdictions involved situations where the parties who waived the privilege and produced the documents argued that they were coerced by the government. Thus, it appears to be an issue of first impression that this court must determine.

The key issue is the meaning of coercion under section 912. The term is not defined in the statute and the annotated cases shed no light on its meaning. Plaintiffs argument that the privileges were waived because the Defendants produced documents and information to the government ignores the factual differences between their cited cases and this one outlined above as well as the difference between a voluntary and volitional act. The relinquishment is voluntary if it was "the product of free and deliberate choice rather than intimidation, coercion, or deception." (People v. Whitson (1998) 17 Cal.4th at p. 247.) On the other hand, although a volitional act may be the product of coercion. (See e.g., Pen. Code §§518, 519; See also People v. Goodman (1958) 159 Cal.App.2d 54, 61 and People v. Goldstein (1948) 84 Cal.App.2d 581, 586.)

Here, Defendants cited the Thompson and Holder Memoranda, Seaboard Report, and other documents analyzing their effect on corporations. In 2002, the federal government created the Corporate Fraud Task Force ("Task Force"), which was comprised of the DOJ, CFTC and FERC. (Exec. Order No. 13271, 67 Fed. Reg. 46091 (July 9, 2002).) The Task Force's primary purpose was to "maximiz[e] cooperation and joint regulatory and enforcement efforts throughout the federal law enforcement community." The court in United States v. Stein (S.D.N.Y. 2006) 435 F.Supp.2d 330, 364, found that The Thompson Memorandum constituted an express threat in the context of the payment of attorney fees for current and former employees being investigated by the government. In addition, the federal government has recently implemented policies to curb the practice of demanding a waiver of the privilege. For example, the United States Sentencing Commission eliminated the provision in the commentary to the Organizational Sentencing Guidelines regarding consideration of disclosure of privileged information as a condition for exercising leniency in sentencing. (U.S. Sentencing Guidelines Manual (2006) §8C2.5.) In addition, the DOJ issued the McNulty Memorandum on December 12, 2006. Said Memorandum removed disclosure of privileged information from the list of factors prosecutors may consider in determining whether to charge a corporation. (Appendix of Non-California Authorities in Support of Defendants' Joint Brief, Exhibit 39 (McNulty Memorandum).) These

Case Title: JCCP4221 COORDINATION PROCEEDING
NATURAL GAS ANTI-TRUST CASES                          Case No: JCCP4221

examples evidence a retreat from the policies set forth in the Thompson and Holder Memoranda and Seaboard Report. Finally, numerous individuals and entities have spoken out against the policy and practice of the government as a result of the above noted memoranda and report.

Importantly, Defendants provided the declarations of counsel and other relevant parties as to their respective dealings with the government. All Defendants provided evidence indicating that they were served with subpoenas to produce the privileged documents and were subsequently pressured to do so when the government determined that they were not complying with the subpoenas that were issued. Therefore, this case is distinguishable from In re Qwest. Furthermore, each defendant was aware of the consequences of being labeled uncooperative (e.g., enforcement action, losing the ability to continue to operate, etc.) and thus produced privileged materials.

As to AEP, it set forth sufficient evidence in its papers and at oral argument that it was coerced to produce its privileged material as a result of a coordinated federal investigation. (Routh Declaration, ¶¶6, 8.)

Based on the foregoing, it is not necessary for this Court to engage in the choice of law analysis urged by defendant AEP Energy Servs, Inc. (hereafter "AEP"). Furthermore, even assuming it was necessary to apply such an analysis to this case, this Court would find that if AEP had not met its burden of showing that the law of California materially differed from the laws in New York and Ohio.

IT IS SO ORDERED.

Ronald S. Prager

Judicial Officer Presiding:  Judge Ronald S. Prager

# EXHIBIT B

1
2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA,

5         v.

6    SCOTT THOMPSON,

7    *Defendant.*

Miscellaneous Docket No.: 1:07-mc-00241-RJL

THE WILLIAMS COMPANIES, INC.'S
APPLICATION FOR RELIEF PURSUANT
TO LCrR 57.6

8

### DECLARATION OF ALEX A. GOLDBERG SUPPORTING THE WILLIAMS COMPANIES, INC.'S APPLICATION FOR RELIEF PURSUANT TO LCrR 57.6

9

10

11    I, Alex A. Goldberg, hereby declare as follows:

12         1.    I am the Assistant General Counsel of The Williams Companies, Inc., parent of

13    Williams Power Company, Inc. (collectively "Williams").  I have been employed by the Williams

14    Legal Department since 1992.  During all relevant times discussed below, I was responsible for

15    coordinating Williams' responses to government investigations related to energy and gas trading

16    activities.  Except where made on information and belief, I have personal knowledge of each of the

17    facts set forth in this declaration and if required, could and would competently testify thereto.

18

19         2.    On October 25, 2002, Williams issued a press release stating, among other things, that

20    it was conducting an independent internal review of its trading activities, including reporting of

21    information regarding natural gas trades to energy publications.  The review was conducted by the

22    law firm of Gray Cary Ware & Freidenrich LLP ("Gray Cary"), Williams' outside legal counsel.

23    Williams further stated that the review was being conducted in conjunction with the Commodity

24    Futures Trading Commission's ("CFTC") ongoing industry-wide investigation.  I was personally

25    involved with Williams' internal investigation and I am familiar with the facts related to that

26    investigation.

27         3.    As part of our internal review, attorneys from Gray Cary and Williams' Legal

28    Department conducted interviews of Williams employees.  During those interviews, the attorneys

1

took notes, which included the contents of attorney-client communications and attorneys' thoughts, mental impressions and opinions regarding information obtained.

4.      As part of its internal review, and through and under the supervision of its attorneys, Williams conducted certain analyses and reports of natural gas transaction data drawn from Williams' gas transaction databases (the "Data Analysis"). The Data Analysis contained and reflected, among other things, communications protected by the attorney work product doctrine and attorney-client privilege and reflected the mental impressions, legal theories and opinions of counsel.

5.      As part of the internal review, Williams' attorneys made presentations to federal prosecutors intended to influence the government's charging decisions.    The presentations contain and reflect, among other things, communications protected by the attorney work product doctrine and attorney-client privilege and reflected the mental impressions, legal theories and opinions of counsel.

6.      In early November 2002, Williams received a subpoena from the U. S. Attorney in the Northern District of California ("USDOJ") as part of a grand jury investigation. The grand jury subpoena demanded production, among other things, of information related to Williams' gas trading activities. Williams believed that it, along with certain of its traders, were the subject of a criminal investigation by USDOJ. While Williams was producing documents in response to this subpoena, the USDOJ issued a memorandum entitled "Principles of Federal Prosecution of Business Organizations," dated January 20, 2003 (the "Thompson Memo"). Williams was aware that its cooperation would be judged based on the terms of the Thompson Memo. Williams was aware that the Thompson Memo required USDOJ to consider a corporation's willingness to waive the attorney client privilege and attorney work product protection in deciding whether to charge a corporation with a criminal offense.

7.      As stated above, the CFTC was investigating Williams' trading activities in late 2002 including allegations of false reporting of information to the trade press. On November 25, 2002, the CFTC stated its belief that Williams was failing to "fully cooperate with its investigation." In

DECLARATION OF ALEX A. GOLDBERG

1    particular, the CFTC explicitly informed Williams that it expected "full cooperation" by Williams

2    which included, "among other things, disclosing the results of . . .Williams' own internal

3    investigations." The CFTC also served a subpoena on November 25, 2002 that explicitly asked for

4    all investigative reports, files, notes, memoranda, audio recordings, witness statements and/or

5    summaries of those statements, and documents related to any internal investigation or inquiry

6    conducted by Williams. Two days later, on November 27, 2002, the CFTC stated that it was

7    "frustrated and disappointed with [Williams'] decision not to turn over" its internal investigation

8    files.

9

10       8.       The USDOJ sought production of the attorney notes taken during the interviews of

11   employees conducted by Williams' attorneys. Williams agreed to provide the notes in response to

12   the grand jury subpoena pursuant to the express agreement with the USDOJ on April 25, 2003 that

13   Williams was not waiving any privilege or protection with respect to any other document and any

14   other subject matter and that such production would not be a waiver of any privilege or protection as

15   to any other action, investigation, case, matter, or party.

16       9.       In or about May 2003, the CFTC again sought production of the same attorney notes

17   provided to the USDOJ on or about April 25, 2003. Williams agreed to provide the notes on or about

18   May 7, 2003 pursuant to the express agreement with the CFTC that, among other things, Williams

19   was not waiving any privilege or protection.

20

21       10.      In or about November 2003, the USDOJ sought production of the Data Analysis.

22   Williams provided such documents pursuant to the express agreement with the USDOJ on

23   January 27, 2004 that, among other things, Williams did not intend to waive to the USDOJ or any

24   third parties, any attorney-client, attorney work product or other applicable privileges.

25       11.      On October 8, 2003 and August 12, 2005, Williams and its counsel made

26   presentations to USDOJ intended to influence the government's charging decisions. As part of these

27   presentations, Williams submitted materials to federal prosecutors.

28

3

DECLARATION OF ALEX A. GOLDBERG

1    12.    The CFTC and USDOJ conducted their investigation of Williams' gas trading activity

2    jointly in many respects. Williams produced thousands of documents to the USDOJ and the CFTC,

3    but initially objected to production of attorney-client and work product documents. The USDOJ and

4    CFTC, however, specifically demanded production of privileged and work product documents. At

5    the time of production, I believed that refusing to produce privileged, work product documents would

6    likely cause Williams to be viewed as uncooperative and would increase the risk that Williams would

7    be the subject of enforcement action and/or criminal indictment. I further believed that such an event

8    would have had severe adverse consequences to Williams' stock price and credit-worthiness. My

9    beliefs were based in large part on the Thompson Memo's emphasis on waiving privilege as an

10   element of cooperation, on the public disclosures that other companies had produced privileged

11   internal investigation materials to the CFTC as part of their cooperation, and on the observation of the

12   fatal impact of Arthur Andersen's indictment to that company. In the environment at that time, I

13   believed Williams had no choice but to provide privileged, work product documents to the

14   government. When Williams made these productions, it did not intend to waive the privilege as to

15   any other party, document or subject matter, and Williams has not produced these materials to any

16   other third party, either voluntarily or by compulsion.

17

18   13.    On July 29, 2004, the CFTC approved an Offer of Settlement between Williams and

19   the CFTC, resolving the CFTC's investigation of gas reporting issues as to Williams.

20   14.    On February 21, 2006, Williams and USDOJ entered into an Agreement which states

21   that, if Williams complies with the Agreement, no criminal prosecution of Williams would be

22   instituted. Williams "acknowledged that its commitment of continuing cooperation with [USDOJ]

23   was one of several important factors that supported the decision of [USDOJ] to recommend that the

24   prosecution of [Williams] be deferred" and that such cooperation included "[n]ot asserting any claim

25   of attorney-client or work product privilege as to any documents, information or testimony requested

26   by [USDOJ] related to internal investigations or contemporaneous advice given to Williams

27   concerning conduct at issue."

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF ALEX A. GOLDBERG

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and understanding.

Executed in Tulsa, Oklahoma on this  th day of June, 2007.


Alex A. Goldberg

DECLARATION OF ALEX A. GOLDBERG

# EXHIBIT C

**U.S. COMMODITY FUTURES TRADING COMMISSION**
140 Broadway
New York, New York 10005
Telephone: (646) 746-9733
Facsimile: (646) 746-9940

Division of
Enforcement

November 25, 2002

<u>Via Facsimile and Certified Mail</u>
Edward P. Davis, Jr., Esq.
Gray Cary Ware & Freidenrich LLP
1755 Embarcadero Road
Palo Alto, California 94303-3340

Walter F. Brown, Jr., Esq.
Gray Cary Ware & Freidenrich LLP
153 Townsend Street, Suite 800
San Francisco, California 94107-1907

Dear Sirs:

I am writing concerning the Williams Companies ("Williams") failure to fully cooperate with the investigation by Enforcement Staff of the United States Commodity Futures Trading Commission. As you know, Enforcement Staff is investigating serious allegations of misconduct by Williams, including allegations (1) that Williams engaged in illegal activity to manipulate or attempt to manipulate the natural gas markets, (2) that Williams engaged in illegal round-trip trades, and (3) that Williams submitted to trade indices false, inaccurate or misleading reports concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce to benefit Williams trading positions, all in violation of the Commodity Exchange Act.

Once a company uncovers an allegation of illegal misconduct, Enforcement Staff expects full cooperation by that company. Full cooperation includes, among other things, disclosing the results and the factual documentation in support of those results of Williams' own internal investigations.

So that there can be no mistake as to the information Enforcement Staff is seeking, I am enclosing a subpoena which is, in part, duplicative of several subpoenas already issued by Enforcement Staff. The subpoena is broken down into the following three categories: (1) manipulative trading activity by Williams including but not limited to the Jones Murphy allegations; (2) illegal round-trip trading by Williams; and (3) false, inaccurate or misleading market reports to trade indices. Concerning round-trip trading, see Attachment A, which is a spreadsheet outlining the criteria Williams should use in determining the trades in issue. Enclosed is a diskette containing a computer copy of Attachment A in Excel format for you to incorporate the necessary information.

November 25, 2002

All required information and documents must be produced on or before noon, E.S.T. on December 6, 2002. If Williams fails to provide this information and documents by noon, E.S.T. on December 6, 2002, Enforcement Staff will take all appropriate and necessary action which may include the filing of a public subpoena enforcement action in the appropriate United States District Court.

Please contact me at (646) 746-9760 or Elizabeth Brennan at (646) 746-9747 if you have any questions.

Sincerely,

*Steven Ringer*

Steven Ringer

cc:   Robertson Park,
      Senior Litigation Counsel
      Fraud Section, Criminal Division
      Department of Justice

Enc.

2

# EXHIBIT D

**U.S. CC    IODITY FUTURES TRADING CO.   .IISSION**

140 Broadway
New York, New York 10005
Telephone: (646) 746-9733
Facsimile: (646) 746-9940

**REDACTED**

Division of
Enforcement

November 27, 2002

<u>Via Facsimile and Mail</u>
Edward P. Davis, Jr.
Gray Cary Ware & Freidenrich LLP
1755 Embarcadero Road
Palo Alto, CA 94303-3340

Dear Mr. Davis:

I am writing to clarify any misunderstanding you may have regarding the tone or substance of the letter and subpoena served on Williams dated November 25, 2002. First, it was expressed to you at our November 21st meeting that the Commission was both frustrated and disappointed with your decision not to turn over your investigative files in light of your stated desire to cooperate with our investigation. We were particularly surprised with William's decision not to turn over summaries of witness statements in light of previous discussions where we were led to believe that this would be occurring. Further, it was our understanding that the purpose of the November 21st meeting was for Williams to provide the Commission with an in depth review of its findings including, but not limited to, conclusions and documentation in support of those conclusions. To our surprise, this was not provided at that meeting.

The letter and subpoena are not inconsistent with what was discussed at our November 21st meeting. First, we did consult with the Department of Justice regarding this document production before the subpoena and letter were sent to Williams. Second, we plan to attend any proffer sessions between Thanksgiving and Christmas regarding the specific issues relevant to our investigation. Third, as agreed, the intent of the letter and subpoena were to clarify the documents the Commission is seeking and the manner and time in which they should be produced. It was our understanding that it was the intent of Williams to provide the Commission with documents prior to the proffer session and this letter and subpoena formalize that understanding.

Please clarify what documents Williams intends on providing to the Commission pursuant to the subpoena dated November 25, 2002, and whether these documents will be provided by December 6, 2002. In particular, if documents are not going to be produced based upon a privilege asserted by Williams, please provide the following information:

1. Description of Documents:
   a.   type of document
   b.   general subject matter of document

Edward P. Davis, Jr.
November 27, 2002
Page Two

---

      c.     date of the document

      d.     author of document

      e.     recipients of document

      f.     names of all other persons to whom the contents of the document have been disclosed

2. Description of Oral Communications:

      a.     name of persons making the communication

      b.     name of persons present while the communication was made

      c.     relationship of persons present to the person making the communication

      d.     date and place of communication

      e.     the general subject matter of the communication

      f.     names of all other persons to whom the contents of the communication have been disclosed

3. Applicable privilege asserted by Williams. If the privilege is governed by state law, indicate the state's privilege rule being invoked.

4. Basis for the assertion of privilege.

The Commission seeks to resolve all outstanding requests for documents and information as expeditiously as possible. I thank you in advance for your prompt reply to this letter.

Yours truly,

Steven Ringer

cc:    Walter Brown
        Robertson Park

# EXHIBIT E



# GRAYCARY.

1755 Embarcadero Road
Palo Alto, CA  94303-3340
www.graycary.com
O] 650-833-2297
F] 650-320-7401

April 25, 2003
*VIA MESSENGER*

Keslie Stewart, Esq.
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue
Room 10-0101
San Francisco, CA 94102

Re:    **The Williams Companies**

Dear Ms. Stewart:

REDACTED

Enclosed are documents bates numbered _____ which
are being produced in response to the grand jury subpoena issued to The Williams Companies
dated November 4, 2002.  These documents constitute

**REDACTED**          **REDACTED**

This production is a limited waiver of the attorney work-product protection, limited to these
this grand jury investigation by your office, and, specifically, the investigation of natural gas price
reporting issues.  This production excludes
having only to do with issues other than natural gas price reporting.  We expressly reserve and do
not waive any privilege and protection with respect to any other document and any other subject
matter.  Further, we expressly reserve and do not waive any privilege and protection for these
documents as to any other action, investigation, case, matter, or party.

We understand that these ·      will be afforded Rule 6(e) protection under the Federal Rules of
Criminal Procedure, and to the extent possible you will assist Williams in preserving the
confidentiality of these

**Gray Cary Ware & Freidenrich LLP**

Keslie Stewart, Esq.
April 25, 2003
Page Two

Please do not hesitate to contact me if you have any questions or concerns regarding this matter.

Very truly yours,

**Gray Cary Ware & Freidenrich LLP**

Edward P. Davis, Jr.
*edavis@graycary.com*

Enclosures

Gray Cary\SF\3087491.1
2102289-13

# EXHIBIT F

REDACTED

# GRAYCARY

1755 Embarcadero Road
Palo Alto, CA 94303-3340
*www.graycary.com*
O] 650-833-2297
F] 650-320-7401

April 23, 2003

Patrick Robbins, Esq.
Assistant United States Attorney
U.S. Department of Justice
11th Floor, Federal Building
450 Golden Gate Ave.
San Francisco, CA 94102

Robertson T. Park, Esq.
Sr. Litigation Counsel, Fraud Section
U.S. Dept. of Justice
10th & Constitution Avenue, NW
BOND Building, 3rd Fl.
Washington, D.C. 20530

Lisa Tenorio-Kutzkey, Esq.
Assistant United States Attorney
U.S. Department of Justice
11th Floor, Federal Building
450 Golden Gate Ave.
San Francisco, CA 94102

Keslie Stewart, Esq.
Assistant United States Attorney
U.S. Department of Justice
11th Floor, Federal Building
450 Golden Gate Ave.
San Francisco, CA 94102

Re:     **The Williams Companies**

Dear Counsel:

As part of its continuing effort to cooperate with your office, the Williams Companies has instructed Gray Cary to waive the attorney work product privilege with respect to our investigation of reports to various publications that publish gas indices.

# REDACTED

As you may know, the CFTC conducted depositions of certain Williams gas traders in October 2002. These depositions covered many subjects, including the gas indices. Although Williams' counsel attended these depositions and took notes of the testimony, we will not be producing those notes in connection with the upcoming production.

It is our understanding that these notes are being produced in response to the Grand Jury subpoena that is presently outstanding, and as a result they will be kept confidential pursuant to Rule 6(e) of the Federal Rules of Civil Procedure. Moreover, it is also our understanding that production of these notes will not be considered a waiver of any privilege as to any party other than the United States, and will not be considered a waiver as to any other subject or issue.

We have requested that counsel for the individual gas traders consent to Williams' production of its attorney interview notes conducted pursuant to the JDA. Without such a waiver, the company is prohibited from disclosing its notes. We have been informed that counsel are considering our



Gray Cary Ware & Freide.    h LLP

April 23, 2003
Page Two

request, but to date we have not received any waivers.  We will continue to urge counsel to waive their JDA rights on this issue.

Pursuant to your request, we have also asked counsel for the individual gas traders to agree that Williams be allowed to produce to you a copy of the JDA.  The agreement is deemed confidential unless all parties agree to a waiver.  We have not been able to secure consent at this time.

# REDACTED

Williams has accepted in good faith your representation that the company's cooperation will play a significant role in the decision about prosecution.  We trust that its waiver of the attorney work product privilege and its willingness to forgo legitimate investigative needs demonstrate Williams' commitment to working with your office and will be reflected in a charging decision.

If you have any questions, please do not hesitate to contact Walt Brown or me.

Very truly yours,

Gray Cary Ware & Freidenrich LLP

Edward P. Davis, Jr.
edavis@graycary.com

# EXHIBIT G

# GRAYCARY.

153 Townsend Street, Suite 800
San Francisco, CA  94107-1907
*www.graycary.com*
O] 415-836-2582
F] 415-836-2501

May 7, 2003
*VIA FACSIMILE (W/O ENCL.) AND FEDERAL EXPRESS*

Steven Ringer, Esq.
U.S. Commodity Futures Trading Commission
140 Broadway
New York, NY  10005

**Re:    The Williams Companies**

Dear Mr. Ringer:

**REDACTED**

Enclosed are copies of documents bates numbered
which were produced to the U.S. Department of Justice in response to the grand jury
subpoena issued to The Williams Companies dated November 4, 2002.  This confirms our
agreement that you will not copy these documents and you promptly will return them upon your
review.  Further, this confirms that we are not waiving any privilege or protection, including Rule
6(e) protection under the Federal Rules of Criminal Procedure, by sending these documents to you
for your review, and we expressly reserve all privileges and protections.

These documents constitute

**REDACTED**

**REDACTED**

These documents are afforded Rule 6(e) protection under the Federal Rules of Criminal Procedure.
Our production of these documents to the Department of Justice constituted a limited waiver of the
attorney work-product protection, limited to these          the grand jury investigation by the
Department of Justice, and, specifically, the investigation of natural gas price reporting issues.  Our
production excluded                                            having only to do with
issues other than natural gas price reporting.  We expressly reserved and did not waive any
privilege and protection with respect to any other document and any other subject matter.  Further,
we expressly reserved and did not waive any privilege and protection for these documents as to
any other action, investigation, case, matter, or party.  Our sending these documents to you for your
review shall not be deemed in any way to expand the limited waiver associated with our production
of these documents to the Department of Justice.

**Gray Cary Ware & Freidenrich LLP**

Steven Ringer, Esq.
May 7, 2003
Page Two

Please do not hesitate to contact me if you have any questions or concerns regarding this matter.

Very truly yours,

Gray Cary Ware & Freidenrich LLP

Walter F. Brown, Jr.
wbrown@graycary.com

Enclosures

Gray Cary\SF\3087925.1
2102289-13

EXHIBIT H

**GrayCary**

2000 University Avenue
East Palo Alto, CA 94303-2248
www.graycary.com
O] 650-833-2297
F] 650-833-2001

July 22, 2003
*Via Facsimile and U.S. Mail*


Armand Nakkab, Esq.
Trial Attorney
U.S. Commodity Futures Trading Commission
140 Broadway
New York, NY 10005


Re:    Your July 11, 2003 demand for tapes


Dear Mr. Nakkab:

Pursuant to our agreement, please return all of the attorney notes we supplied to the CFTC. We would also appreciate written confirmation that the Commission has no copies of these notes.

Thank you for your anticipated cooperation. If you have any questions, please do not hesitate to contact me.



Very truly yours,

**Gray Cary Ware & Freidenrich LLP**

Edward P. Davis, Jr.
*edavis@graycary.com*

# GRAYCARY

2000 University Avenue
East Palo Alto, CA 94303-2248
www.graycary.com
O] 650-833-2297
F] 650-833-2001

March 11, 2004
*VIA FACSIMILE/U.S. MAIL*

Steven Ringer, Esq.
U.S. Commodity Futures Trading Commission
140 Broadway
New York, NY 10005

**Re:    The Williams Companies**

Dear Mr. Ringer:

As you may recall, on May 7, 2003, we provided you with copies of documents    **REDACTED** **REDACTED**          . which were produced to the U.S. Department of Justice in response to a grand jury subpoena and which constitute notes of interviews conducted by Williams and its outside counsel regarding natural gas price reporting issues. In Walt Brown's May 7 letter to you accompanying the documents, we confirmed our agreement that you would not copy those documents and you promptly would return them upon your review. (We also confirmed that we were not waiving any privilege or protection, including Rule 6(e) protection under the Federal Rules of Criminal Procedure, by sending those documents to you for your review, and we expressly reserved all privileges and protections.) Our agreement was again confirmed in my letter to Mr. Nakkab dated July 16, 2003.

The documents that we provided have not yet been returned to us. Pursuant to our agreement, we request that you return them to us as soon as possible. Thank you for your attention to this matter, and please do not hesitate to contact me if you have any questions or concerns.

Very truly yours,

**Gray Cary Ware & Freidenrich LLP**

Edward P. Davis, Jr.
edavis@graycary.com

Gray Cary\SF\3098908.1
2102289-12

EXHIBIT I

## AGREEMENT

Williams Power Company, Inc. ("WPC") formerly Williams Energy Marketing &

Trading Co. ("WEMT"), a Delaware Corporation and a wholly owned subsidiary of The

Williams Companies, Inc. ("Williams"), a Delaware Corporation, by its undersigned officer,

pursuant to authority granted by its Board of Directors, the United States Department of Justice

Fraud Section ("Fraud Section") and the United States Attorney's Office for the Northern

District of California ("USAO NDCal") enter into this Agreement in resolution of the Fraud

Section and the USAO NDCal's ongoing criminal investigation into the knowing delivery of

knowingly inaccurate reports concerning a commodities market by certain former WPC

employees (the "Investigation").

1.      WPC accepts and acknowledges that, if it commits a willful and knowingly

material breach of the terms and conditions of this Agreement, the Fraud Section and/or USAO

NDCal may file a criminal complaint in the appropriate United States District Court charging

WPC with knowingly delivering knowingly inaccurate reports concerning the commodities

market for natural gas, in violation of Title 7, United States Code, Section 13(a)(2).

2.      WPC acknowledges that the Fraud Section and USAO NDCal have developed

information during the Investigation that certain former WPC employees submitted inaccurate

information to natural gas industry publications as set forth in the Statement of Facts attached

hereto as Annex A and incorporated herein by reference. By entering into this Agreement and

by, among other things, the substantial remedial actions it has taken to date, its continuing

commitment of full cooperation as directed by the Fraud Section and USAO NDCal, its

agreement to pay substantial monetary fines, and the other undertakings it has made as set forth

herein, WPC accepts and acknowledges responsibility for the conduct of its former employees as

set forth in the Statement of Facts. WPC agrees it will not contest the admissibility into evidence

of the Statement of Facts in any subsequent criminal proceedings occurring in the event of a breach of this Agreement.

3.    WPC expressly agrees that it shall not, through its present or future attorneys, board of directors, officers, or management employees, make public statements contradicting the Statement of Facts. Should the Fraud Section and USAO NDCal decide in their sole discretion that a public statement by any such person contradicts the Statement of Facts and should be imputed to WPC for the purpose of determining whether WPC has breached this Agreement, they shall notify WPC and provide WPC with an opportunity to publicly correct such statement. WPC shall avoid a breach of this Agreement by publicly correcting such statement within 48 hours after such notification. WPC agrees that in the event that future criminal proceedings were to be brought in accordance with Paragraphs 12 and/or 14 of this Agreement, WPC will not contest the admissibility of the Statement of Facts in any such proceeding.

4.    Consistent with WPC's obligations as set forth above, WPC and its parent company and affiliates, and its present and former officers, agents, and employees shall be permitted to raise and support defenses and/or assert and support affirmative claims in civil and regulatory proceedings relating to the matters set forth in the Statement of Facts. Nothing stated in this Agreement is intended or shall operate as a waiver of WPC's rights under Federal Rule of Evidence 408.

5.    WPC agrees to cooperate fully with the Fraud Section, USAO NDCal, and with any other agency designated by the Fraud Section and/or USAO NDCal, regarding any matter about which WPC has knowledge. WPC's agreement to cooperate shall extend until the completion of the Fraud Section and USAO NDCal's investigation of any criminal activity relating to false reporting concerning natural gas commodities, including any investigations or prosecutions of others.

6.     WPC agrees that its cooperation, as agreed to in Paragraph 5 above, shall include, but is not limited to, the following:

(a)     Completely and truthfully disclosing all information as may be requested by the Fraud Section and/or USAO NDCal with respect to the activities of WPC and its parent company and affiliates, and its present and former officers, agents, and employees, concerning all matters inquired into by the Fraud Section and/or USAO NDCal;

(b)     Assembling, organizing, and providing on request from the Fraud Section and/or USAO NDCal, all documents, records, or other tangible evidence in WPC's possession, custody, or control;

(c)     Not asserting a claim of attorney-client or work-product privilege as to any documents, information, or testimony requested by the Fraud Section and/or USAO NDCal related to internal factual investigations or contemporaneous advice given to WPC concerning the conduct at issue. Notwithstanding the foregoing, nothing in this Section shall be considered a waiver of the attorney-client or attorney work product privileges with respect to the opinions of counsel, mental impressions of counsel, communications between counsel, or lawful advice of counsel, and WPC, its parent company and affiliates shall not be required to produce documents or other evidence with respect to such opinions, mental impressions, communications or advice. In making production of any such documents, WPC neither expressly nor implicitly waives its right to assert any privilege with respect to the produced documents or the subject matter thereof that is available under law against non-parties to this Agreement.

(d)     Using its best efforts to make available its employees to provide information and/or testimony as requested by the Fraud Section and/or USAO NDCal, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law

enforcement authorities. Cooperation under this Paragraph will include identification of witnesses who, to WPC's knowledge, may have material information regarding the matters under Investigation;

(e)    Using its best efforts to make available for interviews, or for testimony, present or former WPC officers, directors, and employees as requested by the Fraud Section and/or USAO NDCal;

(f)    Providing testimony and other information deemed necessary by the Fraud Section, USAO NDCal or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the Fraud Section and/or USAO NDCal.

7.    WPC shall continue to comply with any currently in force written agreements between WPC and any other federal agency as long as any such agreements shall remain in effect.

8.    WPC agrees to pay $50,000,000 to the United States Treasury as a monetary penalty. WPC shall make such payments on the following terms: $20,000,000 within thirty (30) days of the date of the Agreement, and the remaining $30,000,000 to be paid on or before the one year anniversary of this Agreement. If WPC fails to fulfill its obligations to pay the penalty, WPC will not oppose entry of a monetary judgment against it for the unpaid amount. WPC also will not resist collection efforts by the Fraud Section and USAO NDCal.

9.    In light of WPC's remedial actions to date and its willingness to (i) acknowledge responsibility for the conduct of its employees; (ii) continue its cooperation with the Fraud Section, USAO NDCal and other governmental regulatory agencies; (iii) demonstrate its future good conduct and full compliance with the commodities trading laws and generally accepted

4

accounting procedures; and (iv) consent to payment of the monetary penalty set forth in Paragraph 8 above, the Fraud Section and USAO NDCal shall defer any prosecution of WPC pursuant to Paragraph 1.

10.    The Fraud Section and USAO NDCal agree that if WPC has not committed a willful and knowingly material breach of this Agreement for fifteen (15) months from the date of the Agreement, this Agreement shall expire and no criminal prosecution of WPC for matters discussed in this Agreement will be instituted by the Fraud Section or the USAO NDCal. Should the Fraud Section or USAO NDCal determine during the term of this Agreement that WPC has committed any federal crime commenced subsequent to the date of this Agreement, WPC shall, in the sole discretion of the Fraud Section or USAO NDCal, thereafter be subject to prosecution for any federal crimes of which the Fraud Section and/or USAO NDCal have knowledge.

11.    Except in the event of a breach of this Agreement, all investigations relating to the matters set forth in the Statement of Facts that have been, or could have been, conducted by the Fraud Section and USAO NDCal prior to the date of this Agreement shall not be pursued further as to WPC or its parent company and affiliates. The Fraud Section and the USAO NDCal represent that they are aware of no other investigations relating to submission of false, inaccurate, or altered trade data by WPC or its parent company and affiliates as described in the Statement of Facts or to any criminal activities arising from such false, inaccurate, or altered reporting as of the signing of this Agreement.

12.    Should the Fraud Section and USAO NDCal determine that WPC has committed a willful and knowingly material breach of any provision of this Agreement, the Fraud Section and USAO NDCal shall provide written notice to WPC of the alleged breach, and provide WPC with a two-week period in which to request to make a presentation to the Assistant Attorney

General in charge of the Criminal Division to demonstrate that no breach has occurred, or, to the extent applicable, that the breach is not willful or knowingly material or has been cured. The parties hereto expressly understand and agree that should WPC fail to request an audience with the Assistant Attorney General in charge of the Criminal Division within a two-week period of the potential breach, it shall be conclusively presumed that WPC is in willful and material breach of this Agreement. The parties further understand and agree that the Assistant Attorney General's exercise of discretion under this paragraph is not subject to review in any court or tribunal outside of the Criminal Division of the Department of Justice. In the event of a breach of this Agreement that results in a prosecution of WPC, such prosecution may be premised upon any information provided by or on behalf of WPC to Fraud Section and/or USAO NDCal or other government agency at any time, unless otherwise agreed when the information was provided. The Fraud Section and the USAO NDCal agree, however, to recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment in the event of a subsequent prosecution.

13.    WPC shall expressly waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Northern District of California for the period that this Agreement is in effect.

14.    In case of the willful and knowingly material breach of this Agreement, any prosecution of WPC relating to the false reporting of trade data to industry publications or any crime arising therefrom that is not time-barred by the applicable statute of limitations as of the date of this Agreement may be commenced against WPC notwithstanding the expiration of any

applicable statute of limitations during the deferred prosecution period and up to the determination of any such willful and knowingly material breach. WPC's waiver of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel.

15.    WPC agrees that, if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement.

16.    It is understood that this Agreement is binding on WPC, the Fraud Section and USAO NDCal, but specifically does not bind any other federal agencies, or any state or local law enforcement or licensing authorities, although the Fraud Section and USAO NDCal will bring the cooperation of WPC and its compliance with its other obligations under this Agreement to the attention of other federal agencies, state and local law enforcement, or licensing authorities, if requested by WPC or its attorneys. It is understood that this Agreement also excludes any natural persons. It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individuals or other entities other than the parties hereto, and that nothing in the Agreement shall be admissible in any proceeding other than a proceeding brought by the Fraud Section or the USAO NDCal. Moreover, WPC may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

17.    WPC, the Fraud Section and USAO NDCal agree that this Agreement may be publicly disclosed.

18.    This Agreement sets forth all the terms of the agreement between WPC, the Fraud Section and USAO NDCal. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the USAO NDCal, WPC's attorneys, and a duly authorized representative of WPC.

On Behalf of the United States Department of Justice:

2/21/06

DATE

PAUL E. PELLETIER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

ROBERTSON T. PARK
Assistant Chief, Fraud Section
Criminal Division
United States Department of Justice

AMANDA L. RIEDEL
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

2/21/06

DATE

KEVIN V. RYAN
United States Attorney
Northern District of California

KESLIE STEWART
Assistant United States Attorney
Northern District of California

On Behalf of WPC:

DATE

Williams Power Company, Inc.

8

18.    This Agreement sets forth all the terms of the agreement between WPC, the Fraud

Section and USAO NDCal.  No modifications or additions to this Agreement shall be valid

unless they are in writing and signed by the Fraud Section, the USAO NDCal, WPC's attorneys,

and a duly authorized representative of WPC.

**On Behalf of the United States Department of Justice Fraud Section:**

_____        _____

DATE                            PAUL E. PELLETIER
                                Acting Chief, Fraud Section
                                Criminal Division
                                United States Department of Justice


                                ROBERTSON T. PARK
                                Assistant Chief, Fraud Section
                                Criminal Division
                                United States Department of Justice


                                AMANDA L. RIEDEL
                                Trial Attorney, Fraud Section
                                Criminal Division
                                United States Department of Justice


_____DATE
KEVIN V. RYAN
United States Attorney
Northern District of California

                                KESLIE STEWART
                                Assistant United States Attorney
                                Northern District of California

**On Behalf of WPC:**
2-21-06
_____
DATE                            _____
                                Williams Power Company, Inc.

8

## ANNEX A:
## STATEMENT OF FACTS

For purposes of resolving a criminal investigation by the United States Department of Justice Fraud Section ("Fraud Section") and the United States Attorney's Office for the Northern District of California ("USAO NDCal") into the knowing delivery of knowingly inaccurate reports concerning a commodities market by certain WPC employees (the "Investigation"), the following statement of facts is set forth:

1.      Williams Power Company, Inc. ("WPC") is a Delaware corporation headquartered in Tulsa, Oklahoma. It is a separately incorporated, wholly-owned subsidiary of The Williams Companies, Inc. ("Williams"). WPC traded and marketed natural gas and related products and services.

2.      WPC divided its natural gas traders into groups, referred to as desks. Some of the desks corresponded with geographic regions of the United States: the East, Mid-Continent and West. WPC also established other trading desks, including Forward Trading desks, for trading natural gas futures, options contracts, and other instruments related to, among other things, the New York Mercantile Exchange, a primary forum for energy trading. The desks traded a variety of physical and financial instruments, including fixed-price physical natural gas, derivatives, swaps, index-based, over-the-counter, and physical contracts. Each desk was staffed by several traders.

3.      Certain WPC natural gas traders entered data regarding trades they made into spreadsheets that in turn were delivered to trade publications. These trade publications generated market price indices for natural gas at various delivery points, or "hubs," based in part on information received from industry participants. Natural gas traders used the published indices

1

to price and settle certain physical and over-the-counter financial derivative natural gas transactions.

4.    *Inside FERC* ("*IFERC*") Gas Market Report, a publication of Platts, a McGraw-Hill company, publishes market price indices for natural gas at various delivery points, or "hubs," based in part on information received from industry participants. From at least June 1, 1998, through approximately October 31, 2002, certain WPC employees submitted data to *IFERC* regarding natural gas trades, while acting within the course and scope of their employment. *IFERC* editors exercised judgment and attempted to exclude numbers that diverged from the majority of trades at a given hub. WPC does not contest that misrepresenting either the prices or volumes reported to *IFERC* could alter the published *IFERC* index prices.

5.    From on or about June 1, 1998, through on or about October 31, 2002, certain WPC employees submitted inaccurate reports to *IFERC* regarding trades of natural gas entered into by WPC during bid week, the last several business days of the month during which trades for gas flowing the following month were executed.

6.    From approximately June 1, 1998, through approximately October 31, 2002, to benefit WPC's gas trading positions, certain WPC employees submitted trade data to *IFERC* for WPC's East and West desks which contained knowingly inaccurate data, including incorrect volume and/or prices, fictitious trades or incomplete reports of actual trades. Certain WPC employees, on limited occasions, also attempted to conceal the falsity of these submissions by providing misleading and inaccurate information to *IFERC* employees who contacted them to confirm reported trade information.

7.    In approximately October 2002, when media reports exposed false reporting by traders at another energy company, WPC's management discovered the above-described conduct

2

and reported this information to the Commodity Futures Trading Commission ("CFTC"). WPC has cooperated with the CFTC's inquiry into possible inaccurate reporting by WPC, its current and former employees, and with the Investigation.

8.     There are other matters known to the parties that are not included in this statement of facts.

3