## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>SCOTT THOMPSON )<br><br>Defendant ) | Misc. Docket No.: 1:07-MC-00241-RJL<br><br>**FILED**<br><br>JUN 1 9 2007<br><br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

### DEFENDANT SCOTT THOMPSON'S CONSENT MOTION FOR
### LEAVE TO LATE FILE RESPONSE TO THE WILLIAMS COMPANIES, INC.'S
### APPLICATION FOR RELIEF PURSUANT TO LCrR 57.6
### IN UNITED STATES V. SCOTT THOMPSON (1:06-CR-00288-RJL-1)

Defendant Scott Thompson, through counsel, respectfully moves this Court for leave to file one day late his response to The Williams Companies, Inc.'s Application for Relief Pursuant to LCrR 57.6 in *United States v. Scott Thompson* (1:06-CR-0028-RJL-1) (hereinafter "Williams' Brief"), which is attached to this Motion as Exhibit 1. In support of this motion, to which Williams consents, defendant states as follows:

1.      At a hearing on May 30, 2007, the Court set forth a briefing schedule calling for The Williams Companies, Inc. to file its brief in this matter by June 7, 2007, and for defendant to file his responsive pleading by June 18, 2007.

2.      Due to unexpected developments in other ongoing cases, the undersigned was unable to complete defendant's responsive pleading by midnight on June 18.

3.      In the early morning of June 19, undersigned counsel sought and obtained the consent of counsel to The Williams Companies for defendant's late filing, and authority for the undersigned to so represent in this submission.

**RECEIVED**

JUN 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4.    Defendant's delay poses no prejudice to Williams, and the requested relief is justified given the good cause shown and the substantial harm defendant would experience due to denial of relief.

WHEREFORE, for the foregoing reasons, Defendant Scott Thompson requests that the Court grant this motion for leave to late file and direct the Clerk to file in the docket of the above-referenced matter Defendant Scott Thompson's Response to The Williams Companies, Inc.'s Application for Relief Pursuant to LCrR 57.6 In *United States v. Scott Thompson* (1:06-Cr-00288-RJL-1), which is attached hereto as Exhibit 1.

Respectfully submitted,

Philip T. Inglima (D.C. Bar No. 420119)
Adrian D. Mebane (D.C. Bar No. 467885)
Ann M. Mason (D.C. Bar No. 491902)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Dated: June 19, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th of June 2007, a true copy of the foregoing Defendant

Scott Thompson's Consent Motion for Leave to Late File Response to The Williams Companies,

Inc.'s Application for Relief Pursuant To LCrR 57.6 In *United States v. Scott Thompson* (1:06-

Cr-00288-RJL-1) was sent via electronic mail to:


F. Joseph Warin, Esquire
Peter E. Jaffe, Esquire
Andrew S. Boutros, Esquire
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036


Robertson Park, Assistant Chief
Amanda L. Riedel, Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
10th & Constitution Ave., NW
Bond Building, 4th Floor
Washington, DC 20530


Adrian D. Mebane

Exhibit

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                           )<br>)<br>SCOTT THOMPSON                    )<br>)<br>Defendant            )<br>_____ ) | Misc. Docket No.:  1:07-MC-00241-RJL |

## DEFENDANT SCOTT THOMPSON'S RESPONSE
## TO THE WILLIAMS COMPANIES, INC.'S
## APPLICATION FOR RELIEF PURSUANT TO LCrR 57.6
## IN UNITED STATES V. SCOTT THOMPSON (1:06-CR-00288-RJL-1)

Defendant Scott Thompson, through counsel, respectfully submits this brief in response to The Williams Companies, Inc.'s Application for Relief Pursuant to LCrR 57.6 in *United States v. Scott Thompson* (1:06-CR-0028-RJL-1) (hereinafter "Williams' Brief").

## I.      INTRODUCTION

In May 2007, the defendant and the government extensively briefed issues of waiver relating to The Williams Companies, Inc.'s ("Williams") compromised attorney-client privilege and attorney work product protection resulting from Williams' decision to produce such materials to no less than three federal agencies as part of its successful bid to receive lenient criminal and regulatory treatment for Williams' conduct relating to gas price reporting.  More than three weeks after it received notice of defendant's motion to compel, and less than 24 hours before this Court was scheduled to consider the matter, Williams moved for "emergency" relief tantamount to intervention in Mr. Thompson's criminal case, which was brought under the same investigation.

As defendant stated on May 30 in orally opposing Williams' eleventh hour filing, the timing of Williams' appearance seemed to be unfairly tactical and unlikely to shed new light on the legal issue before the Court. Williams' Brief confirms this view: Williams had briefed related legal claims in another context, in another court and case, in February of this year, and imported its arguments (and its supporting declaration) substantially unaltered from the pleadings in that case. Williams' thereby introduced to this round of briefing its reliance upon a novel legal theory, foreign to the law of this circuit or any federal court, encapsulated in a "minute order" of a California state trial court, construing a California evidentiary rule. Williams provides no controlling authority in support of its position that it was entitled to disclose privileged materials without consequence because it was "economically coerced." Williams likewise fails to establish under the proper legal standard – which the government and the defendant agree is clearly established in this circuit's precedent – that it has not waived the relevant legal protections. Accordingly, Williams' arguments should be disregarded and defendant's motion to compel should be granted. In addition, based upon the same analysis, defendant's pending motion for an order directing the issuance of a subpoena to Williams under Rule 17(c) of the Federal Rules of Criminal Procedure also should be granted.[1]

---

[1] Williams maintains that it should be entitled to another round of briefing on the Rule 17(c) request, without indicating why it is incapable of determination at this point in time. Williams' Brief at 1 n.2. In its 36 page filing, Williams also does not seize the opportunity to amplify upon a supposed argument that Fed. R. Crim. P. 6(e) somehow precludes the government's releasing documents it subpoenaed under that provision in the very criminal case emanating from it – and so Williams likewise arrogates to itself the opportunity for later briefing on that issue, as well. *Id.* at 33 n. 35. Williams' effort to further protract this proceeding, thereby subjecting defendant to multiplied cost and avoidable delay, should not be sanctioned.

## II.    ARGUMENT

Defendant previously has briefed the controlling legal standard, and will not repeat at length those points and authorities here.  Defendant incorporates by reference his prior briefing in his criminal case.  Here, defendant addresses the unique claims Williams alone has made.[2]

### A.    Williams Waived Any Attorney Client Privilege It Held in the Material It Chose to Produce to the Government

By choosing to produce material to the Government as part of its cooperation with the Federal Energy Regulatory Commission ("FERC"), the Department of Justice ("DOJ") and the Commodities Futures Trading Commission ("CFTC"), Williams implicitly waived any attorney-client privilege it might otherwise have claimed over the material.  *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981).[3]  Williams does not dispute that "[a]ny voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the [attorney-client] privilege."  *Id.* (citing *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).  Williams also concedes that the law of this circuit is that waiver of the attorney-client privilege is not selective, meaning that a waiver as against the government would effect a waiver as against third-parties, like defendant:

---

[2] There has been no briefing by the government in response to Williams' Brief, but it is difficult to imagine that the Department of Justice would embrace Williams' aggressive theory.

[3] Williams states that "a condition precedent for waiver is voluntary disclosure."  Williams' Brief at 7 (citing *Permian Corp.*, 665 F.2d at 1219).  While it is true that voluntary disclosure does waive privilege, no court has ruled that voluntariness is a "condition precedent."  And indeed, inadvertent disclosures of attorney-client privileged material has been found to waive the privilege.  *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) ("The courts will grant no greater protection to those who assert the privilege than [parties'] own precautions warrant.").

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit . . . The attorney client privilege is not designed for such tactical employment.

*Id.*, 665 F.2d at 1221 (rejecting holding of *Diversified Indust., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977)); *see also* Williams Brief at 2. Williams argues, however, that its disclosures were involuntary.

"Short of court-compelled disclosure or other extraordinary circumstances," the D.C. Circuit "will not distinguish between various degrees of 'voluntariness' in waivers of the attorney-client privilege." *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) (citation and footnote omitted). Williams' disclosure was neither court-compelled nor made under extraordinary circumstances.

### B.    Williams Was Not Coerced into Waiving Its Privilege

Williams asserts that it "had no choice: [it] had to comply with the government's demands for production of privileged information." Williams' Brief at 18. This claim is plainly contradicted by the facts and the law.

The facts of this matter are simpler than Williams acknowledges. Williams is a publicly traded corporation subject to numerous layers of regulatory and criminal oversight. Within the scope of their employment, certain Williams employees engaged in conduct they later admitted constituted criminal violations of the Commodities Exchange Act. Under the principle of *respondeat superior*, it is unquestionable that Williams could have been criminally charged for the same conduct. To avoid such an event, and various regulatory consequences from FERC and CFTC, Williams chose to cooperate on every level within its capacity, including by producing otherwise privileged materials to multiple government agencies based on a range of terms that

never included a guarantee of confidentiality and at most featured an offer to maintain

confidentiality "to the extent possible." One agency (FERC) then published a summary of some

of these materials, another (CFTC) apparently returned them to Williams, and the third (DOJ)

now resists producing them to defendant even though they remain in its possession and are

relevant and material to Mr. Thompson's defense of his criminal case.

Williams' arguments in support of DOJ's refusal to produce the materials are rooted

primarily in a totally distinct legal claim from the one advanced by DOJ. Williams maintains

that DOJ economically coerced Williams into producing privileged materials, and that the

materials never lost their privileged status. The sole legal support Williams offers for this

assertion is a recent California Superior Court minute order in a state civil action where a San

Diego County trial judge interpreted a California evidentiary rule exempting "coerced"

disclosures to mean that Williams' production of privileged material to the government was

"involuntary" because it was made under threat of indictment. *See* Williams' Brief at 2 & Ex. A.

This argument and this sole California case ignore the reality of routine waiver findings

in analogous contexts of federal criminal law. It is commonplace for criminal targets – whether

corporations or individuals – to wrestle with unwelcome choices about subordinating one

privilege or right to another interest in order to advance resolution of a threatened prosecution.

Such decisions require careful deliberation, as the well-known consequences entail trade-offs.

Williams made such a choice, and now it seeks an exemption from the effects.

An analogous waiver is made by many criminal targets and defendants in the course of

plea negotiations, as they compromise evidentiary and fifth amendment protections in favor of

"proffer" or "Queen for a Day" terms. Under such agreements, the target acknowledges that the

proffered information can be used against him in a variety of indirect and direct ways before or

at trial, notwithstanding otherwise applicable evidentiary rights.  If the plea negotiations founder, the target finds himself (or itself) in the position of having further equipped the government for the eventual prosecution of that party.

The Supreme Court has upheld the validity of such waivers, despite the disproportionality of negotiating position usually found between the government and such targets, based on the target's hope that his "cooperation" will merit leniency in a charging decision.  In *United States v. Mezzanatto,* the Supreme Court considered a defendant's later claim that his waiver of evidentiary privileges under Rule 11 of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence was ineffective because of the "incredible dilemma" he had faced in deciding to cooperate with the government, stating:

> [t]he dilemma flagged by respondent is indistinguishable from any of a number of difficult choices that criminal defendants face every day.  The plea bargaining process necessarily exerts pressure on defendants to plead guilty and to abandon a series of fundamental rights . . . While confronting a defendant with the risk of more sever punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable – and permissible – attribute of any legitimate system which tolerates and encourages the negotiation of pleas.

513 U.S. 196, 209-10 (1995) (quoting *Corbitt v. New Jersey*, 439 U.S. 212, 219 (1978) and *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)) (internal quotations and citations omitted); *United States v. Burch*, 156 F.3d 1315, 1320 (D.C. Cir. 1998) (expanding *Mezzanato*'s holding to allow use of statements made in plea negotiations in which defendant waived rights under Fed. R. Crim. P. 11 and Fed. R. Evid. 410 in government's case in chief, and noting that the reasoning of *Mezzanato* "resonates beyond the precise question upon which it ruled").

This Court need not dispute Williams' contention that it faced a thorny "dilemma" in determining how to respond to subpoenas and requests for all manner of information, some of

which was subject to privilege.  Because corporations enjoy no fifth amendment protection, *Braswell v. United States*, 487 U.S. 99, 105-08 (1988); *see also Hale v. Henkel*, 201 U.S. 43 (1906), it could not assert such a privilege.  It was confronted with determining whether to continue asserting legal privileges to the materials, in a circumstance where shareholders and regulators alike would probably find assertion of any privilege undesirable if compromise on that point would likely yield enormous value in the avoidance of enforcement consequences, like convictions, fines, industry suspension or debarment, and increased defense costs.  Aided and advised by sophisticated internal and external counsel, Williams elected to secure such benefits and produced the materials in question.  *Cf., e.g., In re Subpoena Duces Tecum*, 738 F.2d 1367, 1372 (D.C. Cir. 1984) (noting the "substantial advantages accruing to voluntary disclosure" to the SEC); *In re Sealed Case*, 676 F.2d 793, 822-23 (D.C. Cir. 1982) (noting that when a corporation "elects to participate" in the SEC's voluntary disclosure program, it necessarily decides that the benefits of participation outweigh the benefits of confidentiality for all [its] files . . ."); *Permian Corp.*, 665 F.2d at 1221 n.14 (SEC offer of inducement for waiver of attorney-client privilege by corporation does not negate voluntariness).

Williams argues that its own waiver was involuntary because it was under "economic duress."  Williams maintains not that the government threatened a wrongful act against the corporation, but rather that Williams could not sustain economically the effects of an indictment – a "threatened" event which Williams makes no pretense to have been legally unwarranted. Moreover, the D.C. federal district court case Williams cites is inapposite and would not support a finding that the facts here establish that Williams' "free will" was negated.  *See Qualls v. Rumsfeld*, 412 F. Supp. 2d 40, 44 (D.D.C. 2006) (waiver involuntary only if government subjected party to "a wrongful act or improper threat").

Likewise, so long as it is the product of a "voluntary and intelligent choice," a criminal

defendant's decision to waive constitutional rights and plead guilty is valid even if he "would not

have pleaded except for the opportunity to limit the possible penalty . . ." *North Carolina v.*

*Alford*, 400 U.S. 25, 27 n.1, 31 (1970) (holding that defendant's guilty plea was voluntary even

where given to take advantage of statute that "provided that if a guilty plea to a charge of first-

degree murder was accepted by the prosecution and the court, the penalty would be life

imprisonment rather than death").[4]  The government may accordingly leverage "anything

lawfully within the power of a prosecutor acting in good faith" in order to induce a plea, up to

and including the threat that he will prosecute a defendant's ill wife if the defendant does not

plead guilty.  *United States v. Pollard*, 959 F.2d 1011, 1021 (D.C. Cir. 1992).[5]

Williams' describes at length its own purportedly woeful circumstances at the time that

government agencies were pressing it to waive privileges.  Williams' Brief at 25-29.  Yet,

Williams does not suggest that the government did not have probable cause and discretion to

indict Williams.  Williams also does not suggest that the government acted in bad faith by, for

example, attempting to wrongly use the obtained disclosures against Williams, or reneging on

---

[4]  This is especially so "where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage." *Alford*, 400 U.S. at 31.

[5]       "To say that a practice is 'coercive' or … 'involuntary' means only that it creates improper pressure that would be likely to overbear the will of some innocent persons and cause them to plead guilty. Only physical harm, threats of harassment, misrepresentation, or promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes) render a guilty plea legally involuntary."

*Pollard*, 959 F.2d at 1021 (quoting *Brady v. United States*, 397 U.S. 742, 750, 755 (1970)) (internal quotations and citations omitted).

the settlements it struck with Williams. *Cf. United States v. Griffin*, 641 F. Supp. 1546,

1549 (D.D.C. 1986) ("if defendant's plea rests in any significant degree on a false promise, plea

loses its consensual character if such promise is not fulfilled").

Instead, Williams suggests that pressure to waive privileges placed on corporations by the

Thompson Memorandum was "improper" as a matter of law. Williams cites no facts indicative

of the sort of impropriety that could vitiate the voluntariness of Williams' acts. Further,

Williams ignores certain facts that contradict the supposedly coercive nature of the Thompson

Memorandum and underscore the voluntariness of its own actions. First, corporations have

elected to waive privileges in similar circumstances for years, and not just in view of the

Thompson Memorandum. *See, e.g., In re Martin Marietta*, 856 F.2d 619, 621, 623 (4th Cir.

1988) (finding that individual defendant was entitled to obtain materials his former corporate

employer chose to disclose to DOJ as part of its effort to gain favorable disposition). Second,

subsequent to the effective date of the Thompson Memorandum, some corporations still elected

to preserve their privileges and chance indictment rather than disclose internal investigation

findings. *See, e.g., United States v. Reliant Energy Services, Inc., et al.* (Case No. 3:04-cr-

00125-VRW) (N.D.CA.) (Indictment filed Apr. 8, 2004).[6] Third, it is beyond serious question

that today, after DOJ promulgated the McNulty Memorandum constructively rescinding the

Thompson Memorandum, some corporations still are choosing to waive their legal privileges

---

[6] It is noteworthy that in the *Reliant* case, brought by the same joint DOJ task force addressing the same range of alleged Commodities Exchange Act violations as the present criminal case, the targeted corporation ultimately achieved a deferred prosecution agreement ("DPA") with DOJ, dispelling the notion that waiver of privileges upon the threat of indictment was the "only way out." *Id.* (DPA filed Mar. 6, 2007).

associated with internal investigations as a gesture of full cooperation with DOJ and regulatory agencies.

Williams points to only one federal case holding that the Thompson Memorandum was overly coercive: *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006). Yet, the relevant holding in that case is neither binding nor apposite. Williams states (notably without citation to the decision in *Stein*), that the *Stein* court "noted that any suggestion by a federal investigative agency that waiving certain foundational legal protections may help a company stave off indictment is inherently coercive." Williams' Brief at 21. Judge Kaplan made no such statement in *Stein*, and in fact explicitly and repeatedly limited the court's holding. *See, e.g., Id.* at 344, 363. *Stein*, which in any event is not binding on this court, also is distinguishable for several reasons.

First, in *Stein* the corporate entity subject to Thompson Memorandum pressure from the government (KPMG) did not protest pressure to waive a legal privilege; rather, KPMG was induced to deny fees that protected its former *employees'* rights to counsel. Second, the court in *Stein* noted that the pressure on corporations to refuse to pay legal fees often would require the company to choose between cooperation and *breaching agreements with others*, effectively imposing economic punishment on third parties "before anyone has been found guilty of anything." *Id.* at 363. Finally, the *Stein* court seemed to presume that other forms of induced corporate cooperation with DOJ were permissible, including disclosure of investigative findings.

*Id.* at 364 (company can pay legal fees for its former employees and still "bare its corporate soul, stand[] at the government's beck and call to provide information and witnesses . . .").[7]

*Stein* does not advance Williams' specific claim. Indeed, where the corporation in *Stein* was induced by DOJ to undercut individual defendants' rights to counsel and their fifth amendment rights, the Williams objections here threaten to deny Mr. Thompson's access to highly relevant and material information in the possession of both Williams and DOJ, if not other government agencies, as well.

Finally, the manner in which Williams began and ended its cooperation efforts belies the notion that it was "coerced." In its first announcement pertaining to the FERC investigation, Williams lauded the voluntary nature of its efforts.[8] According to FERC's published reports, those efforts subsequently included production of internal investigation findings and witness accounts – materials produced, it seems, prior to the inception of the Thompson Memorandum.[9]

_____

[7] Ironically, Williams protests that it paid such a heavy price in the course of avoiding indictment that it should suffer no limitation to its legal privileges, because it supposedly was "coerced" to disclose privileged materials to abide by the Thompson Memorandum. Yet, Williams claims that it exercised free will and sound business judgment in refusing to advance legal fees on behalf of Mr. Thompson, as required under Delaware law. In the latter instance, so it seems, Williams' adherence to Thompson Memorandum "expectations" was merely coincidental and not compulsory.

[8] Paula Hall-Collins, et al., *Williams Volunteers to Provide FERC Gas Trading Data for Independent Review*, Williams Press Release (June 5, 2002) *available at* http://www.williams.com/newsmedia/2002/20020605_265.htm (referring to its "ongoing cooperation with FERC's investigation of electric and natural gas prices.").

[9] Staff of the Fed'l Energy Reg. Comm'n, *Final Report on Price Manipulation in Western Markets: Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000, at ES-1, III 9-10 (*check cites)* (Fed. Energy Reg. Comm'n Mar. 2003), *available at* http://www.ferc.gov/industries/electric/indus-act/wec.asp [hereinafter *Final Report*] (noting that investigation was a "yearlong" effort ).

11

Nowhere in its brief does Williams assert that DOJ coerced its disclosures to FERC, nor does

Williams reconcile that fact with its principle reliance on the purported unfairness of the

Thompson Memorandum.

Williams settlement with DOJ makes sense of this fact. In its DPA with the Justice

Department, Williams explicitly waived its attorney-client privilege and certain work product

protections as a feature of its cooperation. See Williams' Brief, Ex. I, ¶¶5-6. This agreement

was a ratification of the pattern and extent of cooperation Williams had chosen to provide up

until that point in the investigation – and, some would say, also a vindication of it. But it was not

an involuntary act. It was a reasoned, deliberate, bargained-for factor in the settlement equation.

### C.    Williams Waived Any Work Product Protection

Williams' waiver of the attorney work product protection is announced by its then-

counsel in its April 23, 2003 production letter to DOJ. It clearly states:

> As part of its continuing effort to cooperate with your office, the
> Williams Companies has instructed [then-counsel] to waive the
> attorney work product privilege with respect to [counsel's]
> investigation of reports to various publications that publish gas
> indices.

Williams' Brief, Ex. F at 1. The rationale behind this conscious and voluntary decision also is

set forth in that same letter:

> Williams has accepted in good faith [DOJ's] representation that the
> company's cooperation will play a significant role in the decision
> about prosecution. [Williams] trust that its waiver of the attorney
> work product privilege and its willingness to forgo legitimate
> investigative needs demonstrate Williams' commitment to working
> with [DOJ] and will be reflected in a charging decision.

*Id.* at 2. And so it was: having waived these privileges, Williams obtained the result it sought.

Now, Williams expends considerable argument maintaining that it never intended to

waive the work product protection, and that its conduct demonstrates that such waiver did not

occur.  After conceding (as the government and defendant concurred previously) that the

applicable standard for determining what constitutes a waiver of work product is set forth in *In re*

*Subpoena Duces Tecum*, 738 F.2d at 1372, *see* Williams' Brief at 32, Williams challenges the

voluntariness of its productions, while also defending the reasonableness of its expectations that

the government would keep the information confidential.  Williams' Brief at 33-34; *see id.* at

1372 (noting that "a reasonable basis for believing that the disclosed materials would be kept

confidential by the [recipient]" weighs against a finding of waiver).  The record simply does not

support this claim.

### D.    Williams Had No Reasonable Expectation of Confidentiality

Williams itself concedes that CFTC and DOJ "were not 'friendly' agencies" to which

Williams made its disclosures of privileged materials.  Williams' Brief at 25 (citing *Permian*

*Corp.*, 665 F.2d at 1221).  Unlike the government brief, Williams does not argue that it shared

any common interest with the government such as to give it any expectation that its productions

would be kept confidential[10] – hardly a surprise, since Williams asserts that the government

coerced the company.  Yet, Williams does maintain that the accused and the accuser were of the

same mind when it came to protecting Williams' previously privileged disclosures.

Williams states that it "took every effort to protect the privileges associated with these

materials."  Williams' Brief at 27.  Williams obviously did not take "every effort" because it did

not move to quash the subpoena or simply refuse to produce the documents.  Moreover, the

record Williams generated in producing its privileged materials reflects, at best, its aspirations.

---

[10] The government asserted that there was a common interest between it and Williams, at
least relating to Williams' production of a settlement memorandum (and exhibits) and Power
Point slides relating to resolution of the case.  *See* Government's Response to Defendant's
Motion to Compel ("Gov't Response") at 12.

Williams describes its April 25, 2003 letter to DOJ as "an agreement," but the letter contains no statement of an agreement, only an assertion of limited waiver and non-waiver; that is, it expresses unilateral statements on Williams' part of what it *intended* to waive. *See id.,* Ex. E at 1 ("This production is a limited waiver . . . We expressly reserve and do not waive . . .") The same unilateral terms appear in Williams' letters of transmittal to DOJ dated July 14, 2003 and July 23, 2003. *See* Gov't Response, Attachs. C & D; *but cf.* Williams' Brief, Ex. G at 1 (stating to CFTC that "[t]his confirms our agreement that you will not copy these documents and . . . will return them"). Williams memorialized an agreement when there was one, but there is no such language in Williams' letters to DOJ.

Williams also does not cite any evidence of an agreement on the government's part to *actually keep* Williams' documents confidential.[11] Mr. Goldberg's declaration on behalf of Williams about the circumstances of its disclosures is conspicuously silent on any "agreement" with the government like that described in the brief. *See* Williams' Brief, Ex. B. Williams cites only the government's own vague and undocumented assertion, in its brief in response to Defendant's motion to compel, that "attorneys for the government, in conversations with Williams' counsel and in accepting the materials," agreed to Williams' request for confidentiality. Williams' Brief at 27 (citing Gov't Response at 6); *see also id.* at 33. It does not address or refute defendant's argument that this kind of assertion is insufficient for this

---

[11] As Defendant has argued previously, moreover, even if the government "agreed" that Williams was "not waiving" its privileges as to third parties, this would not alter the waiver analysis because waiver as to a third party not in privity is not a matter as to which two parties can agree – rather, what constitutes waiver is a determination that can only be made by a court after a case-by-case evaluation of the circumstances of the first disclosure. *In re Subpoena Duces Tecum,* 738 F.2d at 226. Moreover, there are some promises the government cannot keep, such as a promise that what is received by the grand jury will not later be publicly disclosed in connection with the trial of a person charged on the basis of that investigation.

proceeding, much less explain how that agreement could constitute more than a hollow aspiration. *See* Def's May 22 Reply Brief at 7 (discussing proof of confidentiality agreement in *Permian,* 665 F.2d at 1218).

The closest thing to a statement manifesting agreement in Williams' transmittal letters to the government is Williams' unanswered assertion that it "understand[s] that . . . to the extent possible [the government] will assist Williams in preserving the confidentiality of these [redacted]." Williams Brief, Ex. E at 1; Gov't Response, Attachs. C & D.  As defendant already has noted, and Williams does not refute, the government could not promise that the documents would remain confidential and did not do so.  Any pledge of confidentiality for documents being summoned by grand jury subpoena would be meaningless because of the possibility that prosecutions featuring defendants with procedural and substantive discovery rights would flow from the grand jury probe.  The government thus could only promise that it would assist Williams's efforts to keep the documents confidential "*to the extent possible.*"  Willaims' Brief, Ex. E at 1.

Williams' hope for confidentiality was futile particularly given that, by the time of its DOJ productions, Williams already had disclosed privileged material to FERC.  There is no evidence that its FERC productions were made pursuant to any terms that could reasonably give Williams confidence that the information would remain confidential, and any such confidence would have been destroyed in March 2003 when FERC published the content of certain Williams interview memoranda and results of its analysis.  Accordingly, Williams never had a reasonable expectation of confidentiality in the disclosed materials.  If ever that hope seemed availing, it was extinguished before Williams even concluded the process of making disclosures to DOJ.

E.    **The D.C. Circuit Does Not Recognize the "Settlement Privilege," and Even If It Did, that Privilege Would Not Apply Here**

Williams acknowledges that the D.C. Circuit has not adopted the common law privileges known in some jurisdictions as the "settlement privilege." *See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 755 (D.C. Cir. 2006). Even so, Williams argues that this theory supported the subjective reasonableness of its supposed expectations of confidentiality when it made disclosures. This claim is not justified and should be disregarded.

Quite apart from the lack of justification for construing a new legal privilege in this circuit, Williams fails to explain how a Sixth Circuit case handed up after many of William's disclosures of privileged materials had been made could have reasonably conditioned Williams' subjective reasonable expectations throughout this matter. Moreover, Williams has not sufficiently addressed which documents would fall within this privilege, were it accepted. *See Id.* at 752 (noting failure of WD Energy to meet its burden to provide "very specific descriptions of the documents it claimed were privileged" in declining to rule on privilege). Williams does not provide the defendant or the Court sufficient evidence from which to judge whether the documents in question are "actually a settlement document as opposed to just some information that is being submitted to the investigating agency in an attempt to cooperate in the investigation or to talk the agency out of taking any enforcement action." *Id.* at 753 (internal quotations omitted). Williams does not even assert that any of its particular productions were "settlement documents" for purposes of the caselaw.[12] And indeed, Williams did not reach settlement with

---

[12] Mr. Goldberg's declaration indicates that every production to the CFTC was made "in an attempt to cooperate" and/or an attempt to avoid indictment, just the sort of disclosure the

(continued...)

16

the CFTC until 2004, and with the DOJ until 2006. *See* Williams' Brief, Ex. E at ¶¶ 13-14. In

short, William has not met its "burden"

> to build a record containing specific information about the disputed
> documents and the factual context for the privilege claim,
> including information about when settlement discussions began,
> what representations were made by those involved, and what
> documents were created or submitted to the [government agency]
> to facilitate those discussions. Only then would the district court
> be in a position to evaluate [Williams'] claim that the listed set of
> documents would be protected from disclosure by a federal
> settlement privilege under Fed. R. Evid. 501.

*Id.* at 754. This argument represents yet another instance of Williams' attempting to advance a

new legal principle in this circuit to exempt decisions and actions that it intelligently and

voluntarily took without reasonable expectation of relief.

## F.    The Information Defendant Seeks Is Material to His Defense

Scott Thompson faces a felony indictment returned through the same criminal

investigation in which Williams made decisions about reservation and waiver of legal privileges.

Williams' information then became a part of that investigation, and fodder for a charging

decision and indictment. Public references to some of that disclosed information, and the

implications of a comprehensive internal investigation, indicate that within the disclosed

materials are a variety of documents and facts relevant to the prosecution of Mr. Thompson and

---

(continued)

D.C. Circuit has indicated does not fall within the privilege. *See* Williams' Brief, Ex. E at ¶¶ 7-9 (noting that its production of "the notes," including notes of witness statements, followed CFTC and DOJ subpoenas and CFTC's complaints about Williams' level of cooperation); *id.* ¶ 10 (noting production of Data Analysis but not noting intent of production); *id.* ¶ 11 (noting that "presentations" made to the DOJ were "intended to influence the government's charging decisions"); *id.* ¶12 (noting generally that productions were made in an effort to be cooperative and to decrease chance of enforcement action and/or indictment).

material to his defense. The government's and Williams' attempts to narrowly construe criminal discovery rights do not negate this fact.[13] Defendant requires the information here sought, and he is entitled to it under the authorities cited in his earlier briefs.

## III. **CONCLUSION**

For the foregoing reasons, Williams' application for relief pursuant to LCrR 57.6 should be denied. For the reasons set forth above and in defendant's prior motion papers, and for such additional reasons as may be set forth at the June 22 hearing in this matter, defendant's motion to compel should be granted, and defendant should gain access to all information Williams yielded to the government in its pre- and post-DPA communications about this matter.

Respectfully submitted,

Philip T. Inglima (D.C. Bar No. 420119)
Adrian D. Mebane (D.C. Bar No. 467885)
Ann M. Mason (D.C. Bar No. 491902)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Dated: June 19, 2007

---

[13] Williams' suggestion that defendant can obtain what information he needs by interviewing the witnesses he identified in his Rule 17(c) subpoena ignores the government's discovery obligations and blinks reality. *See* Williams' Brief 29 n.33. None of Williams' current or former employees are going to cooperate with an individual facing charges in this probe, and if they did they would neither be inclined nor well able to describe all of the prior statements they had made to others, such as internal investigators, which are memorialized and in the possession of both Williams and the government.

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th of June 2007, a true copy of the foregoing Defendant Scott Thompson's Response to The Williams Companies, Inc.'s Application for Relief Pursuant To LCrR 57.6 In *United States v. Scott Thompson* (1:06-Cr-00288-RJL-1) was sent via electronic mail to:

>       F. Joseph Warin, Esquire
>       Peter E. Jaffe, Esquire
>       Andrew S. Boutros, Esquire
>       GIBSON, DUNN & CRUTCHER LLP
>       1050 Connecticut Avenue, NW
>       Washington, DC  20036
>
>
>       Robertson Park, Assistant Chief
>       Amanda L. Riedel, Trial Attorney
>       U.S. Department of Justice
>       Criminal Division, Fraud Section
>       10th & Constitution Ave., NW
>       Bond Building, 4th Floor
>       Washington, DC 20530

Adrian D. Mebane